**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| MELISSA LOVE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.  4:14-cv-00015-RLY-TAB |
| | ) | |
| MICHAEL RICHARD PENCE, in his | ) | |
| official capacity as Governor of the State of | ) | |
| Indiana, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR IMMEDIATE PRELIMINARY AND**
**PERMANENT INJUNCTIVE RELIEF**

GREGORY F. ZOELLER
Attorney General of Indiana

THOMAS M. FISHER
Solicitor General

Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
Tel: (317) 232-6255
Fax: (317) 232-7979
Tom.Fisher@atg.in.gov

*Counsel for Defendant Michael Richard Pence*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iv

STATEMENT OF FACTS ..................................................................................1

LEGAL STANDARD..........................................................................................3

ARGUMENT .....................................................................................................4

I.     Preliminary Injunctive Relief Is Inappropriate Because Any Legally Cognizable Injury to Plaintiffs Is Not Irreparable and Neither the Balance of Equities Nor the Public Interest Favors an Injunction ...................................................................4

     A.     In challenges to traditional marriage definitions, the Supreme Court has ruled that injunctions are not appropriate prior to final appellate resolution...................4

     B.     Any legally cognizable injury to Plaintiffs is not irreparable, and a preliminary injunction would not preserve the status quo..........................................................6

     C.     The public interest and balancing of equities weigh against preliminary relief ...............................................................................................................12

II.     Plaintiffs Are Unlikely to Succeed on the Merits ............................................13

     A.     Plaintiffs are unlikely to succeed on the merits because federal court jurisdiction over them is barred by Article III and the Eleventh Amendment.......15

     B.     There is no constitutional right to have one's out-of-state same-sex marriage recognized in Indiana..............................................................................................15

           1.     The Full Faith and Credit Clause does not afford a right of action under Section 1983 and does not apply to substantive choice-of-law issues, such as the validity of out-of-state marriages.................................16

                  a.     The Full Faith and Credit Clause is not enforceable in federal court against state officials...........................................................16

                  b.     The Full Faith and Credit Clause affects only recognition of judgments and the authenticity of records; it does not require States to enforce other States' substantive laws ............................18

                  c.     Section 2 of the federal Defense of Marriage Act is largely immaterial, but is constitutional as far as it goes ..........................21

           2.     Plaintiffs, having asserted no privileges and immunities claim, nonetheless briefly mention the Privileges and Immunities Clause, but do not flesh out what is, in any event, a meritless theory ..................25

3. The Fourteenth Amendment offers no better claims for mandatory interstate recognition of same-sex marriages ............................................... 28

C. Indiana's traditional marriage definition does not violate Plaintiffs' equal protection rights ............................................................................ 33

1. *Baker v. Nelson* still controls, and the core meaning of *Windsor* is to preserve state prerogatives over marriage .................................................. 33

2. No fundamental rights or suspect classes are implicated ........................... 36

a. There is no fundamental right to same-sex marriage, a concept having no roots in the Nation's history and traditions .................. 36

b. Limiting marriage to the union of a man and a woman does not implicate a suspect class ......................................................... 38

i. Traditional marriage does not discriminate based on sex ................................................................................. 38

ii. Traditional marriage does not discriminate based on sexual orientation ................................................................. 39

3. Traditional marriage satisfies constitutional review .................................. 44

a. States recognize opposite-sex marriages to encourage responsible procreation, and this rationale does not apply to same-sex couples ........................................................................ 45

b. Many courts have rejected the theory that traditional marriage is about homosexual animus ............................................ 48

4. No other limiting principle for marriage rights is apparent ...................... 49

D. Traditional marriage does not impinge on the right to freedom of association ................................................................................................. 53

1. Freedom of association is subsumed within due process ........................... 53

2. Indiana's traditional marriage definition is not a "direct and substantial burden" on Plaintiffs' rights ..................................................... 54

E. Traditional marriage does not implicate the right to travel .................................... 57

F. Traditional marriage does not implicate the Establishment Clause ....................... 59

G. Traditional marriage does not violate the Supremacy Clause .............................. 59

CONCLUSION........................................................................................................................60

CERTIFICATE OF SERVICE ................................................................................................61

# TABLE OF AUTHORITIES

CASES

*Adams v. Howerton,*
486 F. Supp. 1119 (C.D. Cal. 1980) ...................................................................46

*Adar v. Smith,*
639 F.3d 146 (5th Cir. 2011) ......................................................................16, 17

*Alaska Packers Ass'n v. Indus. Accident Comm'n,*
294 U.S. 532 (1935)...........................................................................................20

*Alemite Mfg. Corp. v. Staff,*
42 F.2d 832 (2d Cir. 1930)...................................................................................9

*Andersen v. King Cnty.,*
138 P.3d 963 (Wash. 2006)..........................................................................45, 46

*Anderson v. Donahoe,*
699 F.3d 989 (7th Cir. 2012) .............................................................................26

*Baehr v. Lewin,*
852 P.2d 44 (Haw. 1993) ...................................................................................40

*Baker by Thomas v. General Motors Corp.,*
522 U.S. 222 (1998)...........................................................................19, 24, 25

*Baker v. Nelson,*
191 N.W.2d 185 (Minn. 1971)...........................................................................46

*Baker v. Nelson,*
409 U.S. 180 (1972)......................................................................................33, 37

*Baker v. Wade,*
769 F.2d 289 (5th Cir. 1985) .............................................................................41

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte,*
481 U.S. 537 (1987)...........................................................................................54

*Bd. of Trs. of Univ. of Ala. v. Garrett,*
531 U.S. 356 (2001)...........................................................................................44

*Bishop v. United States ex rel. Holder,*
962 F. Supp. 2d 1252 (N.D. Okla. 2014).......................................................5, 38

*Bostic v. Rainey,*
No. 2:13-cv-395, 2014 WL 561978 (E.D. Va. Feb. 13, 2014) ...................... *passim*

iv

CASES [CONT'D]

*Bourke v. Beshear*,
No. 3:13-CV-750-H, 2014 WL 556729 (W.D. Ky. Mar. 19, 2014) ....................................5, 6

*Briggs v. N. Muskegon Police Dep't*,
563 F. Supp. 585 (W.D. Mich. 1983) ......................................................................55

*Bright v. Kuehl*,
650 N.E.2d 311 (Ind. Ct. App. 1995)......................................................................27

*Broderick v. Rosner*,
294 U.S. 629 (1935).........................................................................................26, 27

*C.E.W. v. D.E.W.*,
845 A.2d 1146 (Me. 2004) ..................................................................................51

*Califano v. Gautier Torres*,
435 U.S. 1 (1978).............................................................................................57

*Canipe v. Canipe*,
918 F.2d 955, 1990 WL 180118 (4th Cir. 1990) ....................................................17

*Catalano v. Catalano*,
170 A.2d 726 (Conn. 1961) ................................................................................30

*Celebration Int'l, Inc. v. Chosun Int'l, Inc.*,
234 F. Supp. 2d 905 (S.D. Ind. 2002) .............................................................12, 13

*Chicago United Indus., Ltd. v. City of Chicago*,
445 F.3d 940 (7th Cir. 2006) ................................................................................6

*Citizens for Equal Prot. v. Bruning*,
455 F.3d 859 (8th Cir. 2006) .........................................................41, 46, 55, 56

*City of Cleburne v. Cleburne Living Center*,
473 U.S. 432 (1985).........................................................................................42

*Cnty. of Sacramento v. Lewis*,
523 U.S. 833 (1998).........................................................................................36

*Conaway v. Deane*,
932 A.2d 571 (Md. 2007) ..................................................................................46

*Cook v. Cook*,
104 P.3d 857 (Ariz. Ct. App. 2005).....................................................................30

*Cook v. Gates*,
528 F.3d 42 (1st Cir. 2008) ................................................................................41

CASES [CONT'D]

*Cross v. Baltimore City Police Dep't*,
  73 A.3d 1186 (Md. Ct. Spec. App. 2013) ............................................................................55

*Cunningham v. Cunningham*,
  206 N.Y. 341 (1912) ..........................................................................................................30

*De Leon v. Perry*,
  No. SA-13-CA-00982-OLG, 2014 WL 715741 (W.D. Texas Feb. 26, 2014) ........................5

*Dean v. District of Columbia*,
  653 A.2d 307 (D.C. 1995) ..................................................................................................46

*DeBoer v. Snyder*,
  No. 14-1341 (6th Cir. Mar. 25, 2014)................................................................................5, 6

*Diversified Mortg. Investors v. U.S. Life Title Ins. Co. of New York*,
  544 F.2d 571 (2d Cir. 1976)...................................................................................................7

*E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*,
  414 F.3d 700 (7th Cir. 2005) ...............................................................................................12

*Equal. Found. of Greater Cincinnati, Inc. v. City of Cincinnati*,
  128 F.3d 289 (6th Cir. 1997) ...............................................................................................41

*Franchise Tax Board of California v. Hyatt*,
  538 U.S. 488 (2003)......................................................................................................19, 24

*Gianni Cereda Fabrics, Inc. v. Bazaar Fabrics, Inc.*,
  335 F. Supp. 278 (S.D. N.Y. 1971).......................................................................................13

*Glasgo v. Glasgo*,
  410 N.E. 2d 1325 (Ind. Ct. App. 1980) ...............................................................................27

*Gonzales v. North Township of Lake County, Indiana*,
  4 F.3d 1412 (7th Cir. 1993) ...................................................................................................8

*Goodridge v. Dep't of Pub. Health*,
  798 N.E.2d 941 (Mass. 2003) ..............................................................................................37

*Goodwin v. George Fischer Foundry Sys., Inc.*,
  769 F.2d 708 (11th Cir. 1985) .............................................................................................29

*Graham v. Med. Mut. of Ohio*,
  130 F.3d 293 (7th Cir. 1997) .................................................................................................6

*Grayson v. O'Neill*,
  308 F.3d 808 (7th Cir. 2002) ...............................................................................................26

CASES [CONT'D]

*Gunn v. Univ. Comm. to End War in Viet Nam,*
   399 U.S. 383 (1970)..........................................................................................................9

*Harris v. City of Zion,*
   927 F.2d 1401 (7th Cir. 1991) ........................................................................................8

*Hawkins v. Moss,*
   503 F.2d 1171 (4th Cir. 1974) ................................................................................20, 28

*Hemphill v. Orloff,*
   277 U.S. 537 (1928)..................................................................................................20, 28

*Henry v. Himes,*
   No. 1:14-cv-00129-TSB, 2014 WL 1512541 (S.D. Ohio Apr. 16, 2014) ................................5

*Herbert v. Kitchen,*
   134 S. Ct. 893 (Jan. 6, 2014)..........................................................................................5

*Hernandez v. Robles,*
   805 N.Y.S.2d 354 (N.Y. App. Div. 2005) ..............................................................39

*Hernandez v. Robles,*
   855 N.E.2d 1 (N.Y. 2006)........................................................................................46, 49

*Hesington v. Hesington's Estate,*
   640 S.W.2d 824 (Mo. Ct. App. 1982)...........................................................................30

*Hohe v. Casey,*
   868 F.2d 69 (3d Cir. 1989)..............................................................................................3

*Hughes v. Fetter,*
   341 U.S. 609 (1951)........................................................................................................18

*Illinois Bell Tel. Co. v. WorldCom Tech., Inc.,*
   157 F.3d 500 (7th Cir. 1998) ......................................................................................3, 4

*In re Kandu,*
   315 B.R. 123 (Bankr. W.D. Wash. 2004).....................................................................46

*In re Lawrance,*
   579 N.E.2d 32 (Ind. 1991) ............................................................................................10

*In re M.C.,*
   195 Cal. App. 4th 197 (2011) ........................................................................................51

*In re Marriage of J.B. & H.B.,*
   326 S.W.3d 654 (Tex. App. 2010)...........................................................................46, 49

CASES [CONT'D]

*In re Parentage of L.B.,*
122 P.3d 161 (Wash. 2005) ................................................................................51

*Jackson v. Abercrombie,*
884 F. Supp. 2d 1065 (D. Haw. 2012) .................................................37, 38, 45, 46

*Johnson v. Robinson,*
415 U.S. 361 (1974) ...............................................................................35, 44

*K.M. v. E.G.,*
37 Cal. 4th 130 (2005) ................................................................................51

*Kerrigan v. Comm'r of Pub. Health,*
957 A.2d 407 (Conn. 2008) ............................................................................37

*Kitchen v. Herbert,*
961 F. Supp. 2d 1181 (D. Utah 2013) ............................................................ *passim*

*Korte v. Sebelius,*
735 F.3d 654 (7th Cir. 2013) ...........................................................................12

*LaChappelle v. Mitten,*
607 N.W.2d 151 (Minn. Ct. App. 2000) .................................................................51

*Laikola v. Engineered Concrete,*
277 N.W.2d 653 (Minn. 1979) .........................................................................30

*Lawrence v. Texas,*
539 U.S. 558 (2003) .............................................................................40, 41, 42, 48

*Lofton v. Sec'y of the Dep't of Children & Family Servs.,*
358 F.3d 804 (11th Cir. 2004) ......................................................................41, 46

*Loving v. Virginia,*
388 U.S. 1 (1967) ...............................................................................37, 39, 40, 41

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ..................................................................................26

*Mason v. Mason,*
775 N.E.2d 706 (Ind. Ct. App. 2002) ...................................................................32

*Mem'l Hosp. v. Maricopa County,*
415 U.S. 250 (1974) ..................................................................................57

*Montgomery v. Carr,*
101 F.3d 1117 (6th Cir. 1996) .........................................................................54

CASES [CONT'D]

*Montgomery v. Stefaniak*,
   410 F.3d 933 (7th Cir. 2005) .............................................................55

*Morrison v. Sadler*,
   821 N.E.2d 15 (Ind. Ct. App. 2005).............................................. *passim*

*Nordlinger v. Hahn*,
   505 U.S. 1 (1992)...............................................................................44

*Pacific Employers Ins. Co. v. Indus. Accident Comm'n of State of California*,
   306 U.S. 493 (1939)................................................................18, 19, 20

*Parks v. City of Warner Robins*,
   43 F.3d 609 (11th Cir. 1995) ............................................................55

*Paul v. Virginia*,
   75 U.S. 168 (1868)............................................................................56

*Pers. Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979)....................................................................39, 40

*Preston v. Thompson*,
   589 F.2d 300 (7th Cir. 1978) ...............................................................3

*Price-Cornelison v. Brooks*,
   524 F.3d 1103 (10th Cir. 2008) ........................................................41

*Raftopol v. Ramey*,
   12 A.3d 783 (Conn. 2011) ...............................................................51

*Reno v. Flores*,
   507 U.S. 292 (1993)....................................................................47, 48

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984)............................................................53, 54, 55

*Roche v. Washington*,
   19 Ind. 53 (1862)..............................................................................31

*Romer v. Evans*,
   517 U.S. 620 (1996)....................................................................41, 42

*Rosin v. Monken*,
   599 F.3d 574 (7th Cir. 2010) ............................................................17

*Saenz v. Roe*,
   526 U.S. 489 (1999)....................................................................56, 57

CASES [CONT'D]

*Sclamberg v. Sclamberg*,
41 N.E.2d 801 (Ind. 1942) ...................................................................27, 31

*Schmidt v. Lessard*,
414 U.S. 473 (1974)...................................................................................9

*Schroeder v. Hamilton Sch. Dist.*,
282 F.3d 946 (7th Cir. 2002) ..................................................................41

*Sevcik v. Sandoval*,
911 F. Supp. 2d 996 (D. Nev. 2012)................................................. *passim*

*Siegel v. LePore*,
234 F.3d 1163 (11th Cir. 2000) .................................................................3

*Singer v. Hara*,
522 P.2d 1187 (Wash. Ct. App. 1974).................................................46, 47

*Smelt v. County of Orange*,
374 F. Supp. 2d 861 (C.D. Cal. 2005) ....................................................46

*SmithKline Beecham Corp. v. Abbott Labs.*,
740 F.3d 471 (9th Cir. 2014) ..................................................................41

*Standhardt v. Superior Court ex rel. Cnty. of Maricopa*,
77 P.3d 451 (Ariz. Ct. App. 2003).................................................45, 46, 49

*State of Minn. v. N. Sec. Co.*,
194 U.S. 48 (1904)..................................................................................16

*Steffan v. Perry*,
41 F.3d 677 (D.C. Cir. 1994)...................................................................41

*Stewart v. Lastaiti*,
409 F.App'x 235 (11th Cir. 2010) ...........................................................17

*Sun Oil Co. v. Wortman*,
486 U.S. 717 (1988).......................................................................18, 19, 25

*T.M.H. v. D.M.T.*,
79 So.3d 787 (Fla. Dist. Ct. App. 2011) ..................................................51

*Tanco v. Haslam*,
No. 3:13-cv-01159, 2014 WL 1117069 (M.D. Tenn. Mar. 20, 2014)......................5

*Thompson v. Thompson*,
484 U.S. 174 (1988)................................................................................16

CASES [CONT'D]

*Thrall v. Wolfe*,
  503 F.2d 313 (7th Cir. 1974) ................................................................18

*Tigner v. Texas*,
  310 U.S. 141 (1940)............................................................................44

*United States v. Windsor*,
  133 S. Ct. 2675 (2013)................................................................ *passim*

*V.C. v. M.J.B.*,
  748 A.2d 539 (N.J. 2000)....................................................................51

*Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982)..............................................................................7

*Varnum v. Brien*,
  763 N.W.2d 862 (Iowa 2009) ..............................................................37

*Veney v. Wyche*,
  293 F.3d 726 (4th Cir. 2002) ..............................................................41

*Via v. Taylor*,
  224 F. Supp. 2d 753 (D. Del. 2002)....................................................55

*Washington v. Davis*,
  426 U.S. 229 (1976)............................................................................39

*Washington v. Glucksberg*,
  521 U.S. 702 (1997)..................................................................36, 37, 38

*Westinghouse Elec. Corp. v. Free Sewing Mach. Co.*,
  256 F.2d 806 (7th Cir. 1958) ................................................................7

*Williams v. North Carolina*,
  317 U.S. 287 (1942)............................................................................21

*Wilson v. Ake*,
  354 F. Supp. 2d 1298 (M.D. Fla. 2005)......................................23, 25, 46

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)..................................................................................3

*Wis. Educ. Ass'n Council v. Walker*,
  705 F.3d 640 (7th Cir. 2013) ..............................................................45

*Wolf v. Walker*,
  No. 3:14-cv-00064-bbc (W.D. Wisc. Mar. 4, 2014)...............................6

CASES [CONT'D]

*Wolford v. Angelone*,
   38 F. Supp. 2d 452 (W.D. Va. 1999) ......................................................................55

*Woodward v. United States*,
   871 F.2d 1068 (Fed. Cir. 1989)...............................................................................41

*Zobel v. Williams*,
   457 U.S. 55 (1982)..............................................................................................56, 58

**FEDERAL STATUTES**

28 U.S.C. § 1341 ..........................................................................................................11

28 U.S.C. § 1738A ........................................................................................................17

28 U.S.C. § 1738C ........................................................................................................21

28 U.S.C. § 2403 ..........................................................................................................22

42 U.S.C. § 1983 ....................................................................................................16, 17

**STATE STATUTES**

13 Del. Code § 8-201 ...................................................................................................50

Conn. Gen. Stat. § 46b-20............................................................................................37

Conn. Gen. Stat. § 46b-20-a.........................................................................................37

D.C. Code § 16-831.01 *et seq.* ....................................................................................50

Ind. Code § 16-36-1-3 ..................................................................................................10

Ind. Code § 16-36-1-7 ..................................................................................................10

Ind. Code § 31-11-1-1...................................................................................25, 40, 57

Ind. Code § 31-11-1-1(a) ...............................................................................................1

Ind. Code § 31-11-1-1(b) ...............................................................................................1

Ind. Code § 31-11-4-4 ..................................................................................................31

Ind. Code § 31-11-4-11 ................................................................................................31

Ind. Code § 31-11-8-6 ..................................................................................................30

STATE STATUTES [ CONT'D]

Ind. Code § 31-15-2-6.................................................................................................27

RULES

Fed. R. Civ. P. 5.1...................................................................................................22

Fed .R. Civ. P. 65.................................................................................................4, 6, 7

Fed. R. Civ. P. 65(d)...................................................................................................8

S.D. Ind. Local R. 5.1.1 ............................................................................................22

REGULATIONS

42 C.F.R. § 482.13(h)(3)............................................................................................10

42 C.F.R. § 483.10(j)(1)(viii)......................................................................................10

410 Ind. Admin. Code 16.2-3.1-8(b)(9) ......................................................................10

CONSTITUTIONAL PROVISIONS

U.S. Const. art. IV, § 2.........................................................................................25, 56

U.S. Const. art. IV, § 1.........................................................................................16, 21

OTHER AUTHORITIES

Frank Bruni, *The New Gay Orthodoxy*, N.Y. Times, Apr. 5, 2014, *available at*
http://www.nytimes.com/2014/04/06/opinion/ sunday/bruni-the-new-gay-
orthodoxy.html...................................................................................................43

Gillian E. Metzger, *Congress, Article IV, and Interstate Relations*, 120 Harv. L. Rev. 1468
(2007)................................................................................................................24

Harvey M. Applebaum, *Miscegenation Statutes: A Constitutional and Social Problem*, 53
Geo. L.J. 49 (1964) ...........................................................................................40

Jonathan Turley, *One Big, Happy Polygamous Family*, NY Times, July 21, 2011 ....................53

Joseph Story, *Commentaries on the Conflict of Laws* § 113a (Little Brown, & Co.
6th ed. 1865) ....................................................................................................30

Lynn D. Wardle, *Who Decides? The Federal Architecture of Doma and Comparative
Marriage Recognition*, 41 Cal. W. Int'l L.J. 143 (2010) .............................................22

OTHER AUTHORITIES [CONT'D]

Melanie B. Jacobs, *Why Just Two? Disaggregating Traditional Parental Rights and Responsibilities to Recognize Multiple Parents*, 9 J.L. & Fam. Stud. 309 (2007) ..................51

Michael DiSiena, *Eluding the Grim Reaper: How Section 2 of the Defense of Marriage Act Could Survive Strict Scrutiny*, 19 Wash. & Lee J. Civil Rts. & Soc. Just. 151 (2012).............................................................................................25

Morgan Little, *Gay Marriage Movement Wins Significant Victories in 2013*, LA Times (Dec. 9, 2013), available at http://www.latimes.com/nation/nationnow/la-pn-gay-marriage-movement-gains-2013-20131206,0,1888807.story#axzz2zdVzLoIA ....................43

Ralph U. Whitten, *Full Faith and Credit for Dummies*, 38 Creighton L. Rev. 465 (2005).....................................................................................................19, 20, 23

Restatement (Second) of Conflict of Laws (1971) .................................................19, 29

The Defense of Marriage Act: Hearing Before the S. Comm. on the Judiciary, 104th Cong. 45 (1996) *available at* https://archive.org/details/defenseof marriag00unit...............................................................................................22, 24, 25

*The History of Indiana Law* (David J. Bodenhamer & Randall T. Shepard eds., 2006) ..............40

Timothy Joseph Keefer, *DOMA as a Defensible Exercise of Congressional Power Under the Full-Faith-and-Credit Clause*, 54 Wash. & Lee L. Rev. 1635 (1997) .............................23

Tony Cook & Barb Berggoetz, *Same-Sex Marriage Ban Won't Be on November Ballot*, The Indianapolis Star (Feb. 14, 2014), *available at* http://www.indystar.com/story/news/politics/2014/02/13/hjr-3-last-minute-maneuver-could-spare-2nd-sentence-/5455299/ ..................................................................43

Willystine Goodsell, *A History of the Family as a Social and Educational Institution* (The Macmillan Company 1915).....................................................................51, 52

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Defendant Michael Richard Pence, in his official capacity as Governor of the State of Indiana, respectfully submits this Memorandum in Opposition to the Plaintiffs' Motion for Immediate Preliminary and Permanent Injunctive Relief.

## STATEMENT OF FACTS

Indiana's Defense of Marriage Act provides that "[o]nly a female may marry a male [and o]nly a male may marry a female."  Ind. Code § 31-11-1-1(a).  In addition, "[a] marriage between persons of the same gender is void in Indiana even if the marriage is lawful in the place where it is solemnized." Ind. Code § 31-11-1-1(b).

Plaintiffs are Indiana residents and comprise four same-sex couples.  Compl. ¶¶ 1-5 [Doc. 1].  Two couples—Melissa Love and Erin Brock ("Love-Brock couple") and Michael Drury and Lane Stumler ("Drury-Stumler" couple")—are not married and "wish to be lawfully wed in the State of Indiana."  *Id*. at ¶¶ 2-3.  The other two couples were lawfully married in other jurisdictions and seek "to have their legal marriages recognized in the State of Indiana." *Id*. at ¶¶ 4-5, 9.  Jo Ann Dale and Carol Uebelhoer ("Dale-Uebelhoer couple") were married in Massachusetts in 2008 and Jennifer Redmond and Jana Kohorst ("Redmond-Kohorst couple") were married in New York in 2013.  *Id*. at ¶¶ 4-5.  All of the plaintiffs seek "an order directing [Governor Pence] to require the executive branch to issue marriage licenses and otherwise recognize valid same-sex marriages in the same way that opposite-sex marriages are recognized."  Pls.' Prelim. Inj. Mem. at 33 [Doc. 16].

Plaintiffs generally describe a variety of burdens and inconveniences that may arise for unmarried same-sex couples, but for themselves provide detail only with respect to vague and intangible harms, such as "exclusion from  . . . important moments in life that give life depth and

1

meaning [because] Plaintiffs are subject to exclusion by disapproving family members . . . ."
Pls.' Prelim. Inj. Mem. at 32.  Dale asserts that when she "first realized that [she] was attracted to
other women, it was illegal to be in a same-sex relationship. The fear of criminal action was
internalized and still affects [her] ability to be open."  Dale Aff. ¶ 13.  Her partner, Uebelhoer
states that "[w]hen [their] daughter was young, she had friends who were not allowed to come to
[their] house because [they] were in a same-sex relationship."   Uebelhoer Aff. ¶ 15.   The
Redmond-Kohorst couple "do[es] not hold hands in public or make other displays of affection
because [they] fear retaliation from strangers."   Kohorst Aff. ¶ 25.   The Love-Brock couple
"do[es] not want to have to explain [their] relationship to people they encounter" and wants to be
able to "show up at the hospital to see [each other and] pick[] up [their future] child from school"
with "[n]o questions . . .asked . . . ."  Love Aff. ¶¶ 7-8 [Doc. 15-2]; Brock Aff. ¶¶ 7-8 [Doc. 15-
3].

        Plaintiffs  also  allege  that  Indiana's  marriage  laws  create  "the  additional  burden  of
disproportionate  parental  rights"  to  their  children,  but  do  not  explain  what  this  means.   Pls.'
Prelim. Inj. Mem. at 3.  In any event, all of the Plaintiffs with children declare that the State
recognizes each of them as the parents of their children.  Dale Aff. ¶ 6; Uebelhoer Aff. ¶ 6;
Kohorst Aff. ¶ 5.  The Redmond-Kohorst couple identifies the additional harms of an inability to
"easily change [Redmond's] last name to Kohorst which is the last name shared by her biological
son[,]" and that Kohorst "is still listed as 'father' on the birth certificate [of their son,] not
'parent' or 'mother' since the state does not recognize same sex parents as married."  Kohorst
Aff. ¶¶ 23,24.

        Ultimately, Plaintiffs seek no particular preliminary or final relief bearing on any of the
harms they claim to suffer by virtue of Indiana's traditional definition of marriage or its law

2

precluding recognition of out-of-state same-sex marriages.  They allege no facts showing that their asserted harms are fairly traceable to any action by the Governor, nor that an order issued by him would affect harms caused by other individuals.  Aside from their specific request for marriage licenses—which, again, is directed at the Governor, who has no authority over the issuance of marriage licenses, *see* Def.'s Mem. in Supp. of Mot. to Dismiss at 6-7 [Doc. 19]— Plaintiffs generally demand only "recognition" of their relationships as marriages without explaining what such "recognition" would entail or who would be expected to provide it.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).   While sometimes "[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm," *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978), "[c]onstitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction." *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989).  *See also Siegel v. LePore*, 234 F.3d 1163, 1177-78 (11th Cir. 2000) (per curiam) (rejecting the proposition that "the irreparable injury needed for a preliminary injunction can properly be presumed from a substantially likely equal protection violation" (citation omitted)).   Further, "the probability of success on the merits" must be "sufficiently high—or the injury from the enforcement of the order sufficiently great—to warrant a conclusion that the balance of error costs tilts in favor of relief." *Illinois Bell Tel. Co. v. WorldCom Tech., Inc.*, 157 F.3d 500, 503 (7th Cir. 1998).   Public policy concerns weigh heavy

against relief against government actors, as "the court must consider that all judicial interference with a public program has the cost of diminishing the scope of democratic governance."  *Id.*

## ARGUMENT

Under Rule 65 of the Federal Rules of Civil Procedure, a request for preliminary injunctive relief must specify precisely what relief is to be awarded against which defendant. Here, Plaintiffs seek preliminary relief that broadly "direct[s] Defendant to require the executive branch to issue marriage licenses and otherwise recognize valid same-sex marriages in the same way that opposite-sex marriages are recognized."  Pls.' Prelim. Inj. Mem. at 33.

I.     **Preliminary Injunctive Relief Is Inappropriate Because Any Legally Cognizable Injury to Plaintiffs Is Not Irreparable and Neither the Balance of Equities Nor the Public Interest Favors an Injunction**

A.     **In challenges to traditional marriage definitions, the Supreme Court has ruled that injunctions are not appropriate prior to final appellate resolution**

This case is one among many lawsuits around the country challenging traditional definitions of marriage (*i.e.*, state laws that define marriage as being between one man and one woman).  Many, though not all, of these cases were either initiated or reached final judgment in the wake of *United States v. Windsor*, 133 S. Ct. 2675 (2013).  To date, in light of Supreme Court guidance on the issue, in *no case* does a fully contested preliminary or final permanent injunctive decree precluding enforcement of traditional marriage definitions remain in effect. The thrust of these cases is hard to miss:  The traditional definition of marriage has been around a long time.  Its validity is hotly contested, but the outcome of these legal disputes is uncertain, such that the status quo should remain until the Supreme Court squarely addresses the issue.

1.     On January 6, 2014, the Supreme Court of the United States stayed a *permanent* injunction issued by the United States District Court for the District of Utah in *Kitchen v. Herbert*, 961 F. Supp. 2d 1181 (D. Utah 2013), pending final disposition of an appeal to the

4

Tenth Circuit.  *Herbert v. Kitchen*, 134 S. Ct. 893 (Jan. 6, 2014).  In that case, three same-sex couples challenged Utah's constitutional amendment and statutes upholding the traditional definition of marriage.  *Kitchen*, 961 F. Supp. 2d at 1187.  The district court entered a permanent injunction, now fully stayed, that required officials to issue marriage licenses to same-sex couples and to recognize same-sex marriages validly performed in other States.  *Id*. at 1215-16.

2.      Federal courts across the country have fallen into line by staying injunctions involving traditional marriage definitions, both with respect to licensure of same-sex marriages within a State and recognition of same-sex marriages performed in other jurisdictions.  *See Bishop v. United States ex rel. Holder*, 962 F. Supp. 2d 1252, 1296 (N.D. Okla. 2014) (licensure); *Bostic v. Rainey*, No. 2:13-cv-395, 2014 WL 561978, at *23 (E.D. Va. Feb. 13, 2014) (licensure and recognition); *De Leon v. Perry*, No. SA-13-CA-00982-OLG, 2014 WL 715741, at * 28 (W.D. Texas Feb. 26, 2014) (licensure and recognition); *Bourke v. Beshear*, No. 3:13-CV-750-H, 2014 WL 556729, at * 14 (W.D. Ky. Mar. 19, 2014) (recognition); *DeBoer v. Snyder*, No. 14-1341, Doc. 22-1 at 3 (6th Cir. Mar. 25, 2014) (licensure).

Most recently, in *Henry v. Himes*, No. 1:14-cv-00129-TSB, 2014 WL 1512541, at *1-*2 (S.D. Ohio Apr. 16, 2014), the District Court stayed its ruling pending an appeal to the Sixth Circuit but, with agreement from the defendants, implemented its order requiring defendants to issue birth certificates for the plaintiffs' children listing both same-sex spouses as parents.  The court stayed its final injunction in the main because "[i]t is best that these momentous changes occur upon full review, rather than risk premature implementation or confusing changes . . . [t]hat do[] not serve anyone well."  *Id*. at *1 (quoting *Bourke*, 2014 WL 556729, at *14).[1]

---

[1] Similarly, the court in *Tanco v. Haslam*, No. 3:13-cv-01159, 2014 WL 1117069, at *5 (M.D. Tenn. Mar. 20, 2014) denied a stay of injunction that broadly "bar[s] the defendants and those under their supervision from enforcing [Tennessee's anti-recognition statute and constitutional amendment] against the six named plaintiffs in this action."

The Supreme Court "sent a strong message" with its "unusual intervention" in *Kitchen v. Herbert* that stayed a final, permanent injunction against enforcement of traditional marriage definitions. *Bourke*, 2014 WL 556729, at *14. If a *permanent* injunction must be stayed in this context, it follows that temporary or preliminary relief is inappropriate, particularly given the expedited schedule the parties are following for resolution of the merits of this case. *Wolf v. Walker*, No. 3:14-cv-00064-bbc, Doc. 53 at 3 (W.D. Wisc. Mar. 4, 2014), ("[i]f a preliminary injunction must be stayed as soon as it is entered, it is not clear what purpose it serves.").

### B. Any legally cognizable injury to Plaintiffs is not irreparable, and a preliminary injunction would not preserve the status quo

"Preliminary relief is properly sought only to avert irreparable harm to the moving party." *Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 944 (7th Cir. 2006). Plaintiffs have not shown that they stand to suffer immediate irreparable harm absent a preliminary injunction.

1.    The plaintiff couples seek a preliminary injunction "directing [the Governor] to require the executive branch to issue marriage licenses and otherwise recognize valid same-sex marriages in the same way that opposite-sex marriages are recognized." Pls.' Prelim. Inj. Mem. at 33. However, "preliminary injunctions are intended to preserve the status quo" pending litigation. *Chicago United*, 445 F.3d at 944 (internal quotation marks omitted); *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997) ("[A] mandatory preliminary injunction, that is, an injunction requiring an affirmative act [is] ordinarily cautiously viewed and sparingly issued."). The relief Plaintiffs seek would not preserve the status quo pending litigation, but would instead (apparently) require affirmative acts that would radically change administration of state marriage laws. This request goes well beyond what Rule 65 authorizes. For the couples

---

This injunction would appear ripe for issuance of a stay under *Kitchen*, but officials defending the Tennessee statute have not sought a stay from the Sixth Circuit, which issued a stay in *DeBoer v. Snyder*.

seeking marriage licenses, Plaintiffs cite no imminent external event that would prevent them from applying for, and receiving, marriage licenses once their claims are fully adjudicated. And if these licenses were issued preliminarily and then solemnized, it is hard to see how they could later be "taken back." With marriage licenses, preliminary relief would amount to final relief for these plaintiffs, and is therefore not authorized by Rule 65. *See Westinghouse Elec. Corp. v. Free Sewing Mach. Co.*, 256 F.2d 806, 808 (7th Cir. 1958) (affirming a partial denial of a preliminary injunction because "to have granted all the plaintiff asked would have decided this case upon the merits [and s]uch is not the function of a preliminary injunction"); *see also Diversified Mortg. Investors v. U.S. Life Title Ins. Co. of New York*, 544 F.2d 571, 575-76 (2d Cir. 1976) (holding that it "is not the proper function of [a preliminary] injunction order" to "irrevocably alter[ the rights of all the parties and] permanently deprive[ a party] of a [] defense which, under normal circumstances, would be a valid one").

2.      Plaintiffs also assert that without a preliminary injunction they and their families are "humiliated and degraded by Indiana's ongoing refusal to recognize and acknowledge their unions." Pls.' Prelim. Inj. Mem. at 2. The Love-Brock couple further claims that Indiana's traditional definition of marriage "tells the world that [they] are less, that [they] are not equal, that [they] are not deserving." Love Aff. ¶ 10; Brock Aff. ¶ 10.

Such harm, however, is insufficiently concrete and particularized even to justify Article III cognizability, let alone a preliminary injunction. In *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982), the Court held that "psychological consequences presumably produced by observation of conduct with which one disagrees . . . is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms." *Id*. at 485-86. And the Seventh Circuit has

7

squarely held that mere offense is insufficient to create the controversy needed to confer Article III standing.  In *Harris v. City of Zion,* 927 F.2d 1401, 1405 (7th Cir. 1991), the court held that "[t]he requirement that the plaintiff allege an 'injury-in-fact,' whether economic or non-economic, excludes simple indignation as a basis for Article III standing. That the plaintiff may be offended by the defendants' conduct is not enough to confer standing."  Similarly, when considering the constitutionality of a crucifixion display in *Gonzales v. North Township of Lake County, Indiana*, 4 F.3d 1412, 1416 (7th Cir. 1993), the court stated that "[o]ffense to moral . . . sensitivities does not constitute an injury in fact and is insufficient to confer standing."

*Windsor* does nothing to make these asserted harms cognizable under Article III.  While *Windsor* alluded to the offense or indignity of the plaintiffs in that case, it neither declared those reactions to be sufficient for Article III standing nor made them the object of relief.  Rather, the relief was favorable tax treatment, not simply an abstract directive to no one in particular to "recognize" the plaintiffs' same-sex marriages.  Indeed, if all Plaintiffs seek is to quash an affront to their dignity or the humiliation of their families, there is no apparent reason for any decree to be directed to any particular defendant, for it would do nothing to alter anyone's conduct.  As the district court observed in *Sevcik v. Sandoval*, 911 F. Supp. 2d 996 (D. Nev. 2012), "[a]ny stigma arising out of the State's refusal to recognize same-sex relationships as 'marriages' simply cannot be removed by judicial decree."  *Id*. at 1018.  Accordingly, it is hard to understand how such a preliminary injunction would, as an exercise of the judicial power, afford any relief.

What is more, the Supreme Court has held that the requirement under Rule 65(d) of the Federal Rules of Civil Procedure that a "federal court [must] frame its [preliminary injunctions] so that those who must obey them will know what the court intends to require and what it means

to forbid . . . is absolutely vital in a case where a federal court is asked to nullify a law duly enacted by a sovereign State." *Gunn v. Univ. Comm. to End War in Viet Nam*, 399 U.S. 383, 389 (1970). Plaintiffs must state with specificity not only *who* is to be bound, *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930) ("[N]o court can make a decree which will bind any one but a party; . . . it cannot lawfully enjoin the world at large, [and i]f it assumes to do so, the decree is pro tanto brutum fulmen, and the persons enjoined are free to ignore it."), but also *how* they are to be bound, *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam) ("Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed."). These requirements implicitly foreclose preliminary symbolic relief.

3.  Plaintiffs also list a variety of incidental harms that *may* follow from non-recognition of same-sex marriages in Indiana. For example, the Dale-Uebelhoer couple "constant[ly] worr[ies]" about the "possibility that [a] medical provider's staff will not allow [them] to visit each other or make medical decisions for each other." Dale Aff. ¶ 9; Uebelhoer Aff. ¶ 9. They also "worry that health care providers and assisted living facilities may fail to honor [their] desire to be together and care for one another . . . ." Dale Aff. ¶ 8; Uebelhoer Aff. ¶ 8. The Plaintiffs also claim harms stemming from their inability to "divorce[]" "should they desire to[,]" various "tax penalties[,]" and being excluded from "Indiana's inheritance laws . . . [and] courts for recovery in the event of a wrongful death[.]" Pls.' Prelim. Inj. Mem. at 3, 31.

None of the Plaintiffs, however, ever substantiate that they will, in fact, suffer these harms, but speak in terms only of what *may* occur. One would think, for example, that Plaintiffs could avert uncertainty about hospital visitation and medical decision making through a series of advance directives. Hospitals must honor a patient's directive concerning who may visit and

who may make medical decisions if the patient lacks capacity to make them.  Ind. Code §§ 16-36-1-3,-7 (Health Care Consent Act); *In re Lawrance*, 579 N.E.2d 32, 39 (Ind. 1991) ("Indiana's statutes reflect a commitment to patient self-determination[, and] the decision to allow the transfer of authority [to make healthcare decisions] rests on the principle of the basic human need of self-determination and individual autonomy." (citation omitted)); 410 Ind. Admin. Code 16.2-3.1-8(b)(9) ("subject to reasonable restrictions," a hospital "must provide immediate access to any resident by . . . [anyone] visiting with the consent of the resident."); *see also* 42 C.F.R. § 482.13(h)(3) (hospitals participating in Medicare and Medicaid programs cannot "restrict, limit, or otherwise deny visitation privileges on the basis of . . . sexual orientation . . . ").  Likewise, nursing homes receiving federal funds must honor a resident's visitation wishes.  *See* 42 C.F.R. § 483.10(j)(1)(viii)  ("[T]he facility must provide immediate access to a[] resident by . . . [any person] visiting with the consent of the resident.").  In fact, the Redmond-Kohorst couple has "draft[ed] powers of attorney documents to ensure [they] can retain access to and decision-making powers for each other in times of crisis."  Kohorst Aff. ¶ 9.

One would also think that Plaintiffs could address concerns about post-mortem property distribution by executing will and trust documents that carry out their wishes, and even by way of transferring property to each of their partners in advance of their passing.  In fact, both of the married Plaintiff couples *have* undertaken such preventative measures.  The Redmond-Kohorst couple has "draft[ed] wills and POAs" and ensured that "[b]ank accounts and similar accounts are set up under both names . . . ."  Kohorst Aff. ¶¶ 20, 22.  Similarly, the Dale-Uebelhoer couple "retain[ed] an attorney to prepare documents to help [them] approximate the assumptions embodied in the state law regarding intestacy, bankruptcy exemptions, divorce, post-mortem bodily dispositions, and other laws applicable to married couples."  Dale Aff. ¶ 7; Uebelhoer Aff.

¶ 7.  The Love-Brock couple acknowledges that they could "draft documents" to "approximate the legal benefits of marriage . . . ."  Love Aff. ¶ 6; Brock Aff. ¶ 6.  These measures all demonstrate a lack of irreparable harm absent a preliminary injunction.

Nor do Plaintiffs explain how any of these incidental harms is traceable to the Governor.  The Governor cannot take official action that would permit hospital visitation or medical decision making, secure Social Security benefits, permit intestate succession, authorize handling of funeral arrangements, apply for insurance, affect bankruptcy exemption, or transfer title of real and personal property.  The Governor cannot make plaintiffs' families more welcoming or compel their neighbors to show more tolerance.  *See Sevcik*, 911 F. Supp. 2d at 1018 ("It is not plausible that the People of the State of Nevada will change their views on the matter because of any judicial decree or proclamation by the State (voluntary or not) that conflicts with their private beliefs concerning the nature of marriage.").  Accordingly, no injunction on account of these incidental impacts of marriage law is appropriate.[2]

Similarly, Plaintiffs do not demonstrate that a preliminary injunction would prevent any of these incidental harms from occurring.  A preliminary injunction ordering the Governor to require "the executive branch" to issue marriage licenses would have no effect because "the executive branch" does not issue marriage licenses.  And Plaintiffs do not explain precisely what executive branch recognition means to them and how it would benefit them in any direct way, let alone with respect to the harms they list.  Accordingly, these injunctions must be denied because the claimed relief is far too speculative.

---

[2]  With respect to Plaintiffs' mention of their inability to file joint tax returns, not only have plaintiffs failed to link that injury to any defendant, but in any event the Tax Injunction Act would preclude jurisdiction over a request for such relief.  *See* 28 U.S.C. § 1341 ("The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.").

**C.  The public interest and balancing of equities weigh against preliminary relief**

As the Supreme Court expressly declared in *United States v. Windsor*, 133 S. Ct. 2675, 2691 (2013), and as the Court's stay of final relief in *Kitchen* implies, States have a compelling interest in defining marriage and administering their own marriage laws that outweighs claimed violations of constitutional rights.  Again, the stay in *Kitchen* (and subsequent stays in lower federal courts) demonstrates this principle.  *See Korte v. Sebelius,* 735 F.3d 654, 665 (7th Cir. 2013) ("If the moving party [shows irreparable harm and some likelihood of success on the merits,] the court . . . also considers the public interest.").

Here, the public interest in the continuity of Indiana's marriage laws—*i.e.*, the interest in avoiding the potential for public confusion over a series of judicial injunctions that keep re-setting the definition of marriage—works against preliminary relief.  Preliminary injunctive relief would disrupt public understanding of the meaning and purpose of marriage in Indiana, prompt unreasonable expectations for the clerks around the State to issue unauthorized marriage licenses to all same-sex couples that demand them, raise expectations that any number of Indiana laws pertaining to marriage are suddenly suspended or modified, and generally create unnecessary confusion among the public.  This would be especially damaging with respect to public acts that cannot be undone, such as the issuance of marriage licenses, even if it technically applies only to the plaintiffs in this case.

This is also a matter of balancing the equities, and in this regard, timing matters.  For a preliminary injunction to be appropriate, a Plaintiff's irreparable harm must not be speculative. *See E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005).  Nor, however, can it be an injury that a plaintiff has endured for a substantial period without seeking relief.  *See Celebration Int'l, Inc. v. Chosun Int'l, Inc.*, 234 F. Supp. 2d 905, 920

(S.D. Ind. 2002) (Though not dispositive, "tardiness weighs against a plaintiff's claim of irreparable harm . . . ."). Here, the timing of Plaintiffs' lawsuit weighs against their claims for preliminary relief.

Plaintiffs' claims for preliminary relief in the form of marriage licenses are premature because, once granted, they cannot unilaterally be undone. There is no procedure for cancelling or taking back a marriage license. Furthermore, Plaintiffs' demands for a preliminary injunction designed to assuage incidental harms as well as injuries to pride and dignity, even aside from lack of Article III cognizability, come too late. Plaintiffs do not claim that the various indignities they claim to suffer are newly inflicted. The Dale-Uebelhoer couple and the Redmond-Kohorst couple have been in committed relationships for thirty-five years and sixteen years, respectively, Dale Aff. ¶ 2; Uebelhoer Aff. ¶ 2; Kohorst Aff. ¶ 1, and the Love-Brock couple has been in a committed relationship for two years. Love Aff. ¶ 3; Brock Aff. ¶ 3. Indiana law has never during any of that time recognized same-sex marriages, yet no plaintiffs have sought judicial relief for their alleged dignity harms until now. A plaintiff who suffers supposedly irreparable harm for a substantial period before filing a lawsuit to redress it is not entitled to preliminary relief. *Gianni Cereda Fabrics, Inc. v. Bazaar Fabrics, Inc.*, 335 F. Supp. 278, 280 (S.D. N.Y. 1971). Accordingly, the balancing of equities weighs against preliminary relief.

## II.    Plaintiffs Are Unlikely to Succeed on the Merits

The fundamental merits issue is whether States may confer the special status of "marriage" on qualified opposite-sex couples without also conferring it on any other relationships, including same-sex couples. Legitimate justifications for traditional marriage are long-established, even if sometimes forgotten or deemed old-fashioned. In short, a State may rationally confer civil marriage on one man and one woman in order to encourage the couple to

stay together for the sake of any children that their sexual union may create. Traditional marriage focuses on protecting children and creating optimal childrearing environments, not on celebrating adult romantic relationships. The male-female relationship alone enables the married persons—in the ideal—to beget children who have a biological relationship to both legal parents. In this way, a State's decision to ratify the sexual union between a man and a woman confirms a deeply significant understanding of human relationships and encourages such unions as the standard for the human family.

In contrast, Plaintiffs supply no alternative governmental rationale for bestowing special civic status on same-sex couples. Indeed, they articulate themes both suggesting hostility to marriage (raising the question of why they seek to expand it) and describing marriage as an utterly protean organism that brooks no limit whatever. *See, e.g.,* Pls.' Prelim. Inj. Mem. at 12 ("'[T]raditional marriage,' as a Biblical concept, was far different than the tidy one-man-one-woman model we've more recently embraced. Polygamy was rampant in biblical marriage, sexual slavery was a legitimate foundation for marriage, marriage to a foreigner was blasphemous, and rape victims were forced to marry their rapists.") (footnotes omitted); *id.* at 13 ("In Indiana, marriage has been of questionable benefit to the female participant."); *id.* (describing marriage as "an ever-changing institution that conforms to the realities and demands of the society that recognizes it").

Plaintiffs also frequently invoke their roles as parents and presumably do an excellent job of raising children. Same-sex couples, however, cannot provide the family structure where those who raise a child combine both legal responsibility for and a biological connection with that child. Instead, the central rationale for same-sex marriage is social approval of the couple's sexual relationship as such. But there is no reason for government to take any interest in that

sexual relationship—and certainly nothing like the government's interest in encouraging long-term care for the children produced by heterosexual intercourse.  And because any interest in same-sex couples bears no link to any characteristic innately limited to them, it contains no limiting principle for excluding other groupings of individuals.  Ultimately, there is no legal argument *for* same-sex marriage, only an argument *against* civil marriage as a special, limited status.

A.   **Plaintiffs are unlikely to succeed on the merits because federal court jurisdiction over them is barred by Article III and the Eleventh Amendment**

As described above, and as set forth in more detail in Defendant's Motion to Dismiss, plaintiffs fail to allege any harm fairly traceable to Governor Pence or that can be remedied through an exercise of the judicial power in this case.  Accordingly, this Court lacks jurisdiction over Plaintiffs' claims both as a matter of Article III standing doctrine and as a matter of sovereign immunity and the Eleventh Amendment.  As the case must be dismissed, *see* Def.'s Mem. in Supp. of Mot. to Dismiss at 2-10 [Doc. 19], perforce Plaintiffs cannot succeed on the merits and a preliminary injunction is inappropriate.  Rather than belabor the issue further, the Defendant refers the Court to Defendant's memorandum in support of his Motion to Dismiss.

B.   **There is no constitutional right to have one's out-of-state same-sex marriage recognized in Indiana**

The Dale-Uebelhoer couple and the Redmond-Kohorst couple claim a federal constitutional right to have their Massachusetts and New York marriages recognized by Indiana courts under Indiana law.  Pls.' Prelim. Inj. Mem. at 4-5, 25-28, 30.  They argue that Indiana must accord full faith and credit to the marriage laws of other States, both under the Full Faith and Credit Clause and the Fourteenth Amendment (as a matter of both due process and equal protection).  Neither of these claims is likely to succeed.

15

1.    **The Full Faith and Credit Clause does not afford a right of action under Section 1983 and does not apply to substantive choice-of-law issues, such as the validity of out-of-state marriages**

Article IV, Section 1 of the United States Constitution provides that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State.  And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof." U.S. Const. art. IV, § 1.  This is not a rights-granting provision that can be enforced via 42 U.S.C. § 1983, and in any event it does not require one State to adopt and enforce the substantive law of another State, as Plaintiffs' claim would require.  Section 2 of the Defense of Marriage Act, the constitutionality of which Plaintiffs briefly contest, both confirms State authority in this area and is a valid exercise of congressional power.

a.    **The Full Faith and Credit Clause is not enforceable in federal court against state officials**

Plaintiffs are not likely to succeed on their Full Faith and Credit claim because the Clause does not provide rights enforceable through a declaratory judgment action or through 42 U.S.C. § 1983.  The Full Faith and Credit Clause "only prescribes a rule by which courts, Federal and state, are to be guided when a question arises in the progress of a pending suit as to the faith and credit to be given by the court to the public acts, records, and judicial proceedings of a state other than that in which the court is sitting."  *State of Minn. v. N. Sec. Co.*, 194 U.S. 48, 72 (1904).   As a threshold matter, therefore, it does not, "in either its constitutional or statutory incarnations . . . give rise to an implied federal cause of action." *Thompson v. Thompson*, 484 U.S. 174, 182 (1988).

The Fifth Circuit recently confirmed this understanding in *Adar v. Smith*, 639 F.3d 146, 154 (5th Cir. 2011), where it rejected a claim that the state registrar was required under the Full

Faith and Credit Clause to issue an amended birth certificate listing both same-sex partners as parents based on an out-of-state adoption decree.  The court explicitly held that "the duty of affording full faith and credit to a judgment falls on courts, [so] it is incoherent to speak of vindicating full faith and credit rights against non-judicial state actors."  *Id*.  Accordingly, said the court, "the 'right' [the Full Faith and Credit Clause] confers on a litigant is to have a sister state judgment recognized in courts of the subsequent forum state" and "Section 1983 has no place in the clause's orchestration of inter-court comity—state courts may err, but their rulings are not subject to declaratory or injunctive relief in federal courts."  *Id.* at 151-52.

Similarly, the Seventh Circuit in *Rosin v. Monken*, 599 F.3d 574, 577 (7th Cir. 2010), affirmed the dismissal of an action brought under 42 U.S.C. § 1983, which alleged that requiring an Illinois resident to register as a sex offender for life violated the Full Faith and Credit Clause by refusing to give effect to a New York judgment that had stricken a sex-offender registration provision from a plea agreement.  The court explained that "[t]he Full Faith and Credit Clause was enacted to preclude the same matters' being relitigated in different states as recalcitrant parties evade unfavorable judgments by moving elsewhere.  It was never intended to allow one state to dictate the manner in which another state protects its populace."  *Id.  See also Stewart v. Lastaiti*, 409 F.App'x 235, 236 (11th Cir. 2010) (noting that the "Supreme Court has held that neither the Full Faith and Credit Clause nor 28 U.S.C. § 1738A, the Parental Kidnapping Prevention Act ("PKPA"), creates a federal cause of action for purposes of § 1331 jurisdiction"); *Canipe v. Canipe*, 918 F.2d 955, 1990 WL 180118, at *2 (4th Cir. 1990) (stating that "the Full Faith and Credit Clause of the United States Constitution and its statutory counterparts do not give rise to implied federal causes of action").

Therefore, Plaintiffs' claim under the Full Faith and Credit Clause against the Governor necessarily lacks a constitutional or statutory predicate and cannot succeed. This is especially true in light of Plaintiffs' failure to seek actual tangible relief against an official that can provide it. Full Faith and Credit cases have to do with a party's inability to attain a judicial decree of some sort, but nothing of that nature is at stake here, and there is no "Full Faith and Credit" the Governor can provide. Indeed, Full Faith and Credit cases turn on very specific analyses of the circumstances creating interstate legal conflicts. *See Thrall v. Wolfe*, 503 F.2d 313, 316 (7th Cir. 1974) ("[T]he choice of law requirements which [the Full Faith and Credit Clause] imposes depend on an analysis of the policies underlying the conflicting laws.") (citing generally *Hughes v. Fetter*, 341 U.S. 609 (1951)). A blanket action to have a state law declared unconstitutional on this theory provides no opportunity for such claim-by-claim analysis.

          **b.**    **The Full Faith and Credit Clause affects only recognition of judgments and the authenticity of records; it does not require States to enforce other States' substantive laws**

Even if Plaintiffs have a right of action on this claim, they still cannot succeed on the merits because the Full Faith and Credit Clause requires recognition of *judgments* of other States and does not extend to a State's *acts* or *statutes*. The Supreme Court long ago recognized and explained the necessary distinction between judgments and acts, or statutes, with respect to the application of the Full Faith and Credit Clause. *See, e.g., Pacific Employers Ins. Co. v. Indus. Accident Comm'n of State of California*, 306 U.S. 493, 501 (1939) ("[T]he very nature of the federal union of states, to which are reserved some of the attributes of sovereignty, precludes resort to the full faith and credit clause as the means for compelling a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate."). More recently, in *Sun Oil Co. v. Wortman*, 486 U.S. 717, 729 (1988),

the Court affirmed that the application by a Kansas court of its own statute of limitations, to claims arising under the substantive law of other jurisdictions, did not violate the Full Faith and Credit Clause.  In so doing it reaffirmed the principle that a State cannot be compelled by the Clause to substitute the statute of another State when "dealing with a subject matter concerning which it is competent to legislate." *Id.* at 722 (quoting *Pacific Employers*, 306 U.S. at 501).  *See also Baker by Thomas v. General Motors Corp.*, 522 U.S. 222, 232 (1998) (distinguishing between "the credit owed to laws (legislative measures and common law) and to judgments, and holding that, as to the former, States cannot be compelled "to substitute the statutes of other states for its own statutes."); *Franchise Tax Board of California v. Hyatt*, 538 U.S. 488, 498-99 (2003) (applying the distinction between judgments and statutes to hold that the application of Nevada law to a tort action brought in Nevada by a Nevada resident, against a California tax collection agency, did not violate the Full Faith and Credit Clause).

Nor can the argument that another State's same-sex marriage is a "judgment" withstand scrutiny.  A valid judgment is marked by four criteria: a state with the judicial jurisdiction to act in the case; a "reasonable method of notification is employed and a reasonable opportunity to be heard is afforded to persons affected;" a competent court renders the judgment; and "there is compliance with such requirements of the state of rendition as are necessary for the valid exercise of power by the court." Restatement (Second) of Conflict of Laws § 92 (1971). Marriage has *none* of these elements; it fundamentally does not represent the exercise of judicial power, which is the *sine qua non* of a judgment.

Furthermore, the marriage license itself is not a "record" that is constitutionally due full faith and credit. "[A] license, whether a marriage license or any other sort, is simply evidence of some right or privilege granted by the laws of a state."  Ralph U. Whitten, *Full Faith and Credit*

19

*for Dummies*, 38 Creighton L. Rev. 465, 477 (2005).  If state-issued licenses must be given national application under the Full Faith and Credit Clause, every state would then have to honor the same rights and privileges as the issuing state, including with respect to such licenses as concealed-carry gun permits, law licenses, driver's licenses, medical licenses, and notary public commissions, just to name a few.  *See Hawkins v. Moss*, 503 F.2d 1171, 1176 (4th Cir. 1974) ("[L]icenses to practice law granted by . . . one state, have no extraterritorial effect or value and can vest no right in the holder to practice law in another state."); *see also Hemphill v. Orloff*, 277 U.S. 537, 544, 549, 551 (1928) (holding, against a due process challenge, that a corporation permitted to conduct business in Massachusetts may not do so in Michigan without obtaining a certificate of authority from the Michigan Secretary of State).  As the facial absurdity of these scenarios suggest, the Full Faith and Credit Clause does not compel one state to treat licenses from another state in the same manner it does its own licenses.

Even with respect to judgments, "there are some limitations upon the extent to which a state will be required by the full faith and credit clause to enforce even the judgment of another state, in contravention of its own statutes or policy." *Alaska Packers Ass'n v. Indus. Accident Comm'n*, 294 U.S. 532, 546 (1935).  In *Windsor*, the Supreme Court made it abundantly clear that marriage has been and should be primarily an issue of state concern, one with which the state is intimately and properly concerned.  *United States v. Windsor*, 133 S. Ct. 2675, 2691-92 (2013).  Consequently, whether to recognize out-of-state same-sex marriages is a subject on which States are "competent to legislate," *Pacific Employers*, 306 U.S. at 501, and a matter where a State is not required to enforce a "judgment" or "record" (though marriage, again, is neither) from another State.

20

**c.      Section 2 of the federal Defense of Marriage Act is largely immaterial, but is constitutional as far as it goes**

Finally, removing any doubt (and there should be none) about state maneuverability on the issue of marriage under the Full Faith and Credit Clause, Congress's enactment of Section 2 of the Defense of Marriage Act carries out the Clause in a way that reinforces the statement in *Windsor* that "[e]ach state as a sovereign has a rightful and legitimate concern in the marital status of persons domiciled within its borders."  *United States v. Windsor*, 133 S. Ct. 2675, 2691 (2013) (quoting *Williams v. North Carolina*, 317 U.S. 287, 298 (1942).  This authority includes not only a State's decision to define marriages created under its own laws, but also its decision whether to "recognize" a marriage created under the laws of another jurisdiction. *See id.* at 2692 (noting that New York's decision to "recognize and then to allow same-sex marriages" was "a proper exercise of its sovereign authority"). Accordingly, both Section 2 of DOMA and *Windsor* affirm the constitutionality of state legislation designed to prevent foreign relationships from undercutting their sovereign decisions about marriage.

Article IV, Section 1 of the Constitution provides that "the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof."  U.S. Const. art. IV, § 1.  Section 2 of DOMA is a congressional exercise of the Clause's clearly enumerated "effects" power and provides that "No State, territory, or possession of the United States, or Indian tribe, shall be required to give effect to any public act, record, or judicial proceeding of any other State, territory, possession, or tribe respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State, territory, possession, or tribe, or a right or claim arising from such relationship."  28 U.S.C. § 1738C.

Many scholars contend that Section 2 of DOMA is superfluous because it gives the States no more power than they already possess. *See*, *e.g.*, The Defense of Marriage Act: Hearing Before the S. Comm. on the Judiciary, 104th Cong. 45 (1996) *available at* https://archive.org/details/defenseofmarriag00unit [hereinafter "DOMA Hearing"] (statement of Cass R. Sunstein, Professor of Jurisprudence, Univ. of Chi.) (pointing out that DOMA "gives states no authority that they lack"); Lynn D. Wardle, *Who Decides? The Federal Architecture of Doma and Comparative Marriage Recognition*, 41 Cal. W. Int'l L.J. 143, 151 (2010) ("Section two of DOMA did not change the existing law, but merely codified the long-established federal choice of law rule and full faith and credit principle that states may choose for themselves whether to recognize controversial marriages, validly contracted in other states, or to refuse to apply or enforce laws, rules, and doctrines of sister states that are contrary to the strong public policy of the forum.").

Plaintiffs assert a constitutional challenge to Section 2 of DOMA, though they have apparently taken no steps to notify the Federal Government of this challenge, as required by 28 U.S.C. § 2403, Rule 5.1 of the Federal Rules of Civil Procedure, and Local Rule 5.1.1.  In any event, if the Court were to find that Section 2 of DOMA is constitutionally infirm on a separation of powers or structural rationale, the public policy exception to the Clause would still be available to a state to permit it to recognize marriages congruent with its public policy.

Plaintiffs take only one paragraph to articulate their theory of unconstitutionality and it boils down to the following: "[O]n its face, DOMA would allow states to give no effect whatsoever to the marriage laws and records of a sister state. Such action flies in the face of both the plain language and the original intent of the Full Faith and Credit Clause[.]"  Pls.' Prelim. Inj. Mem. at 28. This argument results from a misunderstanding of the Clause's history and purpose,

along with a tortured reading of the text itself.  It assumes that the first sentence of the Clause provides unalterable guarantees that can never be altered but only enhanced, which is mistaken as to both history and logic.  The original meaning and purpose of the first sentence pertained to evidentiary requirements and methods of proof alone, and was not seen as a substantive, self-executing command to the States.

Rather, it was the second sentence of the Clause, containing the "effects" power, that was a significant addition to its preconstitutional precursors.  That sentence permits Congress to address issues of substance concerning the effect of laws of the several States throughout the Nation.  *See* Timothy Joseph Keefer, *DOMA as a Defensible Exercise of Congressional Power Under the Full-Faith-and-Credit Clause*, 54 Wash. & Lee L. Rev. 1635, 1680 (1997) ("[T]he Full-Faith-and-Credit Clause empowers Congress to protect and administer the unifying principles of the Clause.  If necessary, Congress can exercise its power through the creation of exceptions.  Any other position is inconsistent with the history of the Clause or logic, because the framers foresaw a broad role, and created a broad power, for Congress. Congress's role is meaningless if full faith is already mandatory and Congress is powerless to create exceptions."). Indeed, the "framers and ratifiers understood that Congress had the power to negate state judgments" and "[t]here is literally no evidence that they understood the Effects Clause narrowly."  Ralph U. Whitten, *The Original Understanding of the Full Faith and Credit Clause and the Defense of Marriage Act*, 32 Creighton L. Rev. 255, 386 (1998).  In other words, "because the first sentence of the Clause, as historically understood, does not command a substantive effect to be given to acts, records, and judgments, a congressional declaration that acts, records, and judgments shall have no substantive effect could not possibly undermine the first sentence."  *Id*. at 385.  *See also Wilson v. Ake*, 354 F. Supp. 2d 1298, 1303 (M.D. Fla. 2005)

(rejecting challenge to Section 2 of DOMA and holding that "Congress' actions in adopting DOMA are exactly what the Framers envisioned when they created the Full Faith and Credit Clause.").

The text of the Clause itself only confirms the conclusion that Congress can prescribe that certain "public act[s], record[s], or judicial proceeding[s]" be given no effect. Any other interpretation "would defy the logical principle of noncontradiction." DOMA Hearing at 56-59 (Letter of Professor Michael W. McConnell to Senate Judiciary Committee Chairman Orrin G. Hatch). Indeed, because "states have inconsistent laws on the same subject," any time Congress prefers one State's law to another's, the latter's will be diminished. *Id*. In other words, in exercising its "effects" power Congress will necessarily "give[] effect to some state laws and den[y] effect to others." *Id*.

Additionally, "[b]y its coupling of the Full Faith and Credit and Effects Clauses, the first section of Article IV displays the same model of constitutional rules applicable to the States combined with congressional discretionary authority that is evident in the dormant commerce clause context[,]" and that results in "Congress having authority to enact recognition requirements that might be broader or narrower than those imposed . . . ." Gillian E. Metzger, *Congress, Article IV, and Interstate Relations*, 120 Harv. L. Rev. 1468, 1493-94 (2007). The "Effects Clause," after all, "is broad and unconditional in phrasing." *Id*. at 1494.

Finally, Plaintiffs' argument ignores the many instances in which the Supreme Court has itself determined that certain "public act[s], record[s], or judicial proceeding[s]" be given no effect. *Cf. Franchise Tax Bd. of California v. Hyatt*, 538 U.S. 488, 490 (2003) (affirming that Nevada courts may "refus[e] to extend full faith and credit to California's statute immunizing its tax collection agency from suit"); *Baker ex rel. Thomas v. Gen. Motors Corp.*, 522 U.S. 222,

240-41 (1998) (holding that a Missouri court may permit an expert to testify despite a Michigan injunction forbidding his testimony); *Sun Oil Co. v. Wortman*, 486 U.S. 717, 729 (1988) (permitting a Kansas court to apply its own statute of limitations to claims arising under the substantive law of other jurisdictions).   Indeed, Plaintiffs' argument would imply the unconstitutionality of these decisions—by necessity any judicial ruling choosing one State's law or judgment as controlling will render nugatory the other's.

In sum, "[n]either the history nor the text underlying the Effects Clause can support the peculiar result that would sanction congressional power to expand faith and credit requirements, but not contract them. The power to prescribe sister-state effect contemplates the power to prescribe no effect whatsoever."  Michael DiSiena, *Eluding the Grim Reaper: How Section 2 of the Defense of Marriage Act Could Survive Strict Scrutiny*, 19 Wash. & Lee J. Civil Rts. & Soc. Just. 151, 160-62 (2012); *see also* Hearing at 57 (Letter of Professor Michael W. McConnell to Senate Judiciary Committee Chairman Orrin G. Hatch) ("This interpretation has no support in the language, purpose, or history of the Clause."); *Wilson*, 354 F. Supp. 2d at 1303 ("Congress' actions are an appropriate exercise of its power to regulate conflicts between the laws of two different States, in this case, conflicts over the validity of same-sex marriages.").  Section 2 of DOMA is therefore valid.

> **2.  Plaintiffs, having asserted no privileges and immunities claim, nonetheless briefly mention the Privileges and Immunities Clause, but do not flesh out what is, in any event, a meritless theory**

The Complaint asserts no claims under the Privileges and Immunities Clause of Article IV, Section 2.  Yet on page 27 of their preliminary injunction brief, in the midst of an argument about the Full Faith and Credit Clause, Plaintiffs briefly advert to a theory under the Privileges and Immunities Clause.  They say that, "insofar as [Indiana Code Section 31-11-1-1] den[ies]

access to Indiana courts for divorce or other proceeding premised upon a valid marriage, it violates the Privileges and Immunities Clause as well."   Pls.' Prelim. Inj. Mem. at 27. Continuing, they say that "[r]efusing access to the benefits enjoyed by other lawfully married couples, including divorce, creates conflict and confusion between the states and violates Full Faith and Credit by discriminating against the laws of other states 'under the guise of merely affecting the remedy.'"   *Id.*

First, Plaintiffs cannot succeed on this argument because it is not an actual claim in the case.  *See Anderson v. Donahoe*, 699 F.3d 989, 997-98 (7th Cir. 2012) (Failure to assert claims in governing complaint constitutes waiver); *see also Grayson v. O'Neill*, 308 F.3d 808, 807 (7th Cir. 2002) (A plaintiff "may not amend his complaint through arguments in his brief" in a subsequent motion).  Second, presumably the reason Plaintiffs did not plead a Privileges and Immunities Claim concerning the availability of divorce actions "or other proceeding premised on a valid marriage" for same-sex couples is that they do not, in fact, want to bring any such action.   The Plaintiffs describe themselves as "couple[s]" living together in "committed relationship[s,]" Pls.' Prelim. Inj. Mem. at 2-3**,** not as couples seeking divorce.  Plaintiffs, in other words, have no Article III standing to assert such a claim.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("[Th]e plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is . . . actual or imminent, not conjectural or hypothetical[.]") (internal quotations and citations omitted).

Third, in support of their Privileges and Immunities point, Plaintiffs cite only *Broderick v. Rosner,* 294 U.S. 629, 642-643 (1935), but that case nowhere even mentions the Privileges and Immunities Clause.  It says only that under full faith and credit principles New Jersey courts must entertain enforcement of a New York regulatory assessment against New Jersey residents

who were stockholders in a New York bank. *Id.* at 432-44. For the reasons described in Part II.B.1, full faith and credit has no bearing on whether States must generally recognize other States' same-sex marriages. And to the extent Plaintiffs mean to assert that Indiana courts must provide Indiana citizens with relief available to citizens of other States in their home States' courts, they do not explain why that is so. In *Broderick* New York law controlled because the focus of the regulation—the bank—was in New York. With a divorce action in Indiana courts, the focus of the action must of necessity be Indiana citizens, not citizens of New York, Massachusetts, or elsewhere. *See* Ind. Code § 31-15-2-6 (requiring residency for Indiana marital dissolution).

All of this, of course, begs the basic philosophical question of why, if two parties to a divorce action are not married under state law, do they need a divorce in that state? Marriage status conferred on them by another State would not impede them from taking action inconsistent with that status in Indiana. And if the concern is over property distribution in the event of breakup, Indiana courts have demonstrated the capacity to use principles of contract law and equity to address individual circumstances where no valid marriage exists. *See, e.g., Bright v. Kuehl*, 650 N.E.2d 311, 315 (Ind. Ct. App. 1995) ("we determine that a party who cohabitates with another without subsequent marriage is entitled to relief upon a showing of an express contract or a viable equitable theory such as an implied contract or unjust enrichment"); *Glasgo v. Glasgo*, 410 N.E. 2d 1325, 1330 (Ind. Ct. App. 1980) (the "recognition of a claim for a declaration of property rights in specific property [is not] a claim which reinstates common law marriages."); *Sclamberg v. Sclamberg*, 41 N.E.2d 801, 803 (Ind. 1942) ("[A] court of equity has the inherent power, where the parties appear in said court, and the court has jurisdiction of both

27

the parties and their property to adjudge the marriage void and settle their property rights acquired during the existence of the marriage relation and make an equitable division thereof.").

In all events, Plaintiffs' lack of specificity in this argument underscores why their lack of standing (and indeed why the lack of affirmative cause of action to enforce the Full Faith and Credit Clause) is so important:  the Court cannot know what aspect of "divorce," or even "recognition" more generally, plaintiffs might need to carry on their lives in Indiana; it therefore cannot evaluate the constitutionality of Indiana law or afford relief on this subject.

### 3.    The Fourteenth Amendment offers no better claims for mandatory interstate recognition of same-sex marriages

If the Full Faith and Credit Clause cannot compel one state to recognize marriages from another, the Fourteenth Amendment has no greater role to play.  Plaintiffs cite no cases in support of the proposition that same-sex couples with valid out-of-state marriages have a substantive federal right to have their marriages recognized in Indiana.  Indeed, a claim for interstate marriage recognition is not a free-standing right, but only a derivative claim that turns entirely on the validity of a state's underlying marriage laws.  Here, whether Indiana may refuse to recognize out-of-state same-sex marriages turns entirely on whether Indiana may itself adhere to the traditional definition of marriage.  The staggering implications of Plaintiffs' broader claim for interstate marriage recognition starkly illustrate its foundational flaws.

For starters, there is no federal due process right to have a license issued in one State— whether for professional, weapons, driving, or marriage purposes—treated as valid by government and courts in another.  *See Hawkins v. Moss*, 503 F.2d 1171, 1176 (4th Cir. 1974) ("[L]icenses to practice law granted by . . . one state, have no extraterritorial effect or value and can vest no right in the holder to practice law in another state."); *see also Hemphill v. Orloff*, 277 U.S. 537, 544, 549, 551 (1928) (holding, against a due process challenge, that a corporation

28

permitted to conduct business in Massachusetts may not do so in Michigan without obtaining a certificate of authority from the Michigan Secretary of State).  Otherwise—again--States would have to recognize and treat as valid one another's law licenses, medical licenses, concealed-carry gun permits, driver's licenses, and notary public commissions, just to name a few.

Next, even if an out-of-state marriage is viewed as a purely private contract—which it is not—state and federal constitutions permit rejection of out-of-state contracts that contravene public policy.  *See Goodwin v. George Fischer Foundry Sys., Inc.*, 769 F.2d 708, 712-13 (11th Cir. 1985) ("A state may refuse to enforce a contract, valid in the state where made, if the contract conflicts with the public policy of that state.").  Plaintiffs' constitutional theory in contravention of these baseline principles would effectively require Indiana to conform its marriage policy to the varying marriage policies enacted in other States.  Rather than fostering the States' freedom to experiment with different approaches to difficult social questions, Plaintiffs' theory would empower one laboratory to commandeer others, essentially nationalizing the marriage policy of the most inventive State.

Marriage-recognition principles are rooted in the common law of comity, not due process or any other substantive state or federal constitutional doctrine.  The common law choice-of-law starting point is usually the *lex loci* rule, which says a marriage valid in the State of licensure is valid in other States as well.  But that is not, and never has been, the end of the matter.  The Restatement (Second) of Conflict of Laws § 283(2) (1971) states that even if a marriage "satisfies the requirements of the state where the marriage was contracted," that marriage will not "be recognized as valid" if "it violates the strong public policy of another state which had the most significant relationship to the spouses and the marriage at the time of the marriage."  This "public policy" exception comports with the "Nation's history, legal traditions, and practices,"

and indeed dates back before the Fourteenth Amendment.  *See* Joseph Story, *Commentaries on the Conflict of Laws* § 113a, at 168 (Little Brown, & Co. 6th ed. 1865) (noting that exceptions to out-of-state marriage recognition included "those positively prohibited by the public law of a country from motives of policy").

Such public policy exceptions exist across the country.  *See, e.g., Cook v. Cook*, 104 P.3d 857, 860 (Ariz. Ct. App. 2005) (upholding but not applying Arizona's prohibition on marriages between first cousins); *Hesington v. Hesington's Estate*, 640 S.W.2d 824, 826 (Mo. Ct. App. 1982) (denying recognition of a common-law marriage consummated on a temporary trip to another State); *Laikola v. Engineered Concrete*, 277 N.W.2d 653, 656 (Minn. 1979) (same); *Catalano v. Catalano*, 170 A.2d 726, 731-32 (Conn. 1961) (uncle-niece marriage lawfully contracted in Italy would not be recognized in Connecticut, the domiciliary State of the husband); *Cunningham v. Cunningham*, 206 N.Y. 341, 349 (1912) (holding that a minor female who validly married an adult male in New Jersey could annul her marriage in New York as "repugnant to . . . public policy and legislation").  In none of these cases was there any suggestion that federal due process rights might guarantee interstate marriage recognition.

Indiana is entirely free, therefore, to treat as void marriages from other States that contravene state public policy.  Statutorily, the State not only refuses to recognize out-of-state same-sex marriages, but also any out-of-state marriage entered into for the purpose of evading Indiana's marriage laws—in terms equally applicable to both same-sex *and* opposite-sex couples. Indiana Code Section 31-11-8-6 provides that:

[a] marriage is void if the parties to the marriage:

(1) are residents of Indiana;

(2) had their marriage solemnized in another state with the intent
    to:

30

(A)  evade IC 31-11-4-4 [requiring a marriage license] or IC 31-11-4-11 [precluding issuance of a license if the applicant is mentally incompetent or under the influence] . . .; and

(B)  subsequently return to Indiana and reside in Indiana; and

(3)  without having established residence in another state in good faith, return to Indiana and reside in Indiana after the marriage is solemnized.

Furthermore, as a matter of common law, in the only Indiana Supreme Court decision that Defendant is aware of that addresses an out-of-jurisdiction marriage that could not have been entered into in Indiana, the Court refused to recognize the marriage on public policy grounds. *Sclamberg v. Sclamberg*, 41 N.E.2d 801, 802-03 (Ind. 1942) (treating as void a marriage between uncle and niece).  The parties in that case conceded voidness, but conceding what the law obviously required does not undermine the legal principle the Court employed.

The Indiana Supreme Court has otherwise made it clear that the *lex loci* principle applies only against a backdrop where all agree as to what constitutes a valid marriage.  More than one hundred forty years ago, the court asked, "[w]hat, then, then constitutes the thing called a marriage? [W]hat is it in the eye of the *jus gentium* [law of nations]? It is the union of one man and one woman, 'so long as they both shall live,' to the exclusion of all others, by an obligation which, during that time, the parties can not, of their own volition and act, dissolve, but which can be dissolved only by authority of the State."  *Roche v. Washington*, 19 Ind. 53, 57 (1862). Continuing, the court said, "[n]othing short of this is a marriage. And nothing short of this is meant, when it is said, that marriages, valid where made, will be upheld in other States."  *Id.* This passage confirms the implicit understanding underlying the *lex loci* principle—that it works only if all States basically agree on what constitutes a valid marriage.  When other States

31

recognize same-sex marriages, but Indiana does not, that prerequisite is not met.

Defendant is aware of only one Indiana decision that has given *retrospective* effect to a marriage from another jurisdiction that could not have been undertaken in Indiana: *Mason v. Mason*, 775 N.E.2d 706, 709 (Ind. Ct. App. 2002) (recognizing, for purposes of divorce action and division of property, marriage of first cousins who married under age 65).  But one case from the Indiana Court of Appeals issued in 2002 that essentially seeks to do equity in a particular circumstance does not conclusively establish Indiana common law governing the *prospective* effect of out-of-state marriages that contravene Indiana public policy.

In all events, this is not about weighing one fairly recent Indiana intermediate court decision—*Mason*—against earlier decisions of its hierarchical superior, the Indiana Supreme Court.  It is instead about whether Indiana's statutory refusal to recognize out-of-state same-sex marriages, as a means of carrying out state public policy, is consistent with the American constitutional tradition.  There can hardly be any debate that it is, as ample case law from around the country, only a small fraction of which is cited above, demonstrates.  Indiana does not suffer some special disability in this regard simply because the out-of-state recognition issue has not been litigated enough to provide a robust body of Indiana decisions.  The Constitution does not mean one thing in Indiana and something else in other States when it comes to out-of-state recognition of marriages that contravene state public policy.

Fundamentally, the constitutional validity of Indiana's decision not to recognize out-of-state same-sex marriages turns on the constitutional validity of its traditional marriage definition.  If Indiana can constitutionally adhere to that definition and thereby refuse to provide for same-sex marriages, it can also refuse to recognize same-sex marriages from other States.  **Indiana has**

a legitimate—nay, compelling—interest in ensuring that its democratic process—not that of New York, Massachusetts or any other State—would continue to set marriage policy within the State.

### C.   Indiana's traditional marriage definition does not violate Plaintiffs' equal protection rights

#### 1.   *Baker v. Nelson* still controls, and the core meaning of *Windsor* is to preserve state prerogatives over marriage

*Baker v. Nelson*, 409 U.S. 180 (1972), was a ruling on the merits that upheld Minnesota's traditional definition of marriage.  *Baker* was not overruled by *United States v. Windsor,* 133 S.Ct. 2675 (2013), or any other Supreme Court case and therefore precludes these challenges. Yet Plaintiffs rely heavily on *Windsor*, and claim that it "stands for the proposition that the government must recognize a lawful same-sex marriage."  Pls.' Prelim. Inj. Mem. at 30. *Windsor*, however, is plain and narrow and does not require States to recognize same-sex marriages from other States.  Section 3 of DOMA, which had "the purpose and effect to disparage and to injure those whom *the State*, by its marriage laws, sought to protect in personhood and dignity[,]" violated the Fifth Amendment principally because it was an "*unusual* deviation from the tradition of recognizing and accepting *state definitions* of marriage . . . ." *Windsor*, 133 S. Ct. at 2693, 2696 (emphases added); *see also id.* at 2697 (Roberts, C.J., dissenting) (observing that "[t]he dominant theme of the majority opinion is that the Federal Government's intrusion into an area central to state domestic relations law applicable to its residents and citizens is sufficiently 'unusual' to set off alarm bells." (internal quotation marks omitted)).  It was critical to the Court's analysis that New York had *previously granted* marital interests that federal DOMA then threatened.  *Id.* at 2689.

In contrast, traditional state marriage definitions are, as *Windsor* amply affirms, the "usual" course of business.  *Id*. at 2691.  *Windsor*'s careful distinction between "unusual" federal

marriage law and "usual" state marriage law does not imply the invalidity of the latter.   What is more, the majority opinion expressly rejects any theory that its scope can be expanded to include laws that preserve the traditional marriage definition.   In no uncertain terms, the majority forcefully states that "[t]his opinion and its holding are confined to [New York's recognition of] lawful marriages."   *Id.* at 2696.   It is therefore improper to extrapolate from "this opinion" any rule that affects any other state's marriage laws.

The post-*Windsor* cases that have struck down States' traditional marriage laws not only ignore this plain injunction, but also give short shrift to the principles of federalism underlying the majority opinion and fundamentally misread *Windsor* in at least three ways: (1) that *Windsor* supports the decoupling of marriage and procreation and diminishes the "fundamental" right to marriage to "a loving, rewarding, monogamous relationship with a partner to whom they are committed for life[;]" (2) that *Windsor* deems the relevant question to be whether same-sex marriages harm opposite-sex marriages and/or children, and not whether same-sex marriages further a State's interest in marriages; and (3) that *Windsor*'s denunciation of dignitary harm caused by Section 3 to children of New York's state-provided same-sex marriages can be used against States that do not provide for same-sex marriage.   *See, e.g.*, *Bostic v. Rainey*, No. 2:13-cv-395, 2014 WL 561978, at *17-*20, *22 (E.D. Va. Feb. 13, 2014).

First, there is no doubt that the Constitution gives its blessing to New York to recognize out-of-jurisdiction same-sex marriages.   *Windsor*, 133 S. Ct. at 2692 (explaining that New York's "actions were without doubt a proper exercise of its sovereign authority within our federal system, [which] allow[s] the formation of consensus respecting the way the members of a discrete community treat each other in their daily contact and constant interaction with each other").   It is a considerable leap from this conclusion, however, to read *Windsor*, which struck

34

down Section 3 of DOMA for discriminating against "basic personal relations *the State* has found it proper to acknowledge and protect[,]" *id.* at 2694 (emphasis added), to establish a singular vision of a fundamental right to marriage that must be respected by *all States*.

Lower courts therefore err when they judicially define marriage incompatibly with how a State has chosen to do so. The *Bostic* court, for example, labels marriage as "the right to make a public commitment to form an exclusive relationship and create a family with a partner with whom the person shares an intimate and sustaining emotional bond." *Bostic*, 2014 WL 561978 at *12 (quoting *Kitchen v. Herbert*, 961 F. Supp. 2d 1181, 1202-03 (D. Utah 2013)). Under *Windsor*, the purpose of marriage should instead come from the State, particularly in light of the fact that, as the Court in *Windsor* observed, "marriage between a man and a woman no doubt had been thought of by most people as essential to the very definition of that term and to its role and function throughout the history of civilization." *Windsor*, 133 S. Ct. at 2689.

Second, *Windsor* does not imply that anything more stringent than rational basis review applies. *Id.* at 2696 (ruling that "no legitimate purpose"—a hallmark of rational basis review—justified Section 3). Under that level of scrutiny, the claim that "recognizing same-sex marriage or unions will not *harm* the institution of opposite-sex marriage is not dispositive of the constitutional issue[, but, instead, the] key question . . . is whether the recognition of same-sex marriage would promote all of the same state interests that opposite-sex marriage does, including the interest in marital procreation." *Morrison v. Sadler*, 821 N.E.2d 15, 23 (Ind. Ct. App. 2005); *see Johnson v. Robinson*, 415 U.S. 361, 383 (1974). It is a simple biological truth that same-sex couples cannot further a State's interest in responsible procreation because they cannot procreate unintentionally. *See* Part *See* Part II.C.3.a, *infra*. The State is not obligated under rational basis

review to circumscribe marriage so tightly as to also exclude those who are unwilling or unable to procreate.  *See* Part II.C.3.a, *infra*.

Lastly, *Windsor* does not establish that harm to the dignity of same-sex couples and their children equates to a constitutional violation notwithstanding a State's legitimate interests in preserving the traditional definition of marriage.  *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998).  The Court carefully observed in *Windsor* that New York had already granted the "recognition and protection" of marriage to same-sex couples, and it was the *removal* of that status for federal purposes, in essence "creating two contradictory marriage regimes within the same State[,]" that "places same-sex couples in an unstable position of being in a second-tier marriage [and] humiliates tens of thousands of children now being raised by [them]." *Windsor*, 133 S. Ct. at 2694-95.  With traditional marriage laws, any harm to dignity is not similarly the result of withdrawing rights once granted, which was the focus of *Windsor*.

### 2. No fundamental rights or suspect classes are implicated

#### a. There is no fundamental right to same-sex marriage, a concept having no roots in the Nation's history and traditions

Supreme Court precedent does not support a fundamental constitutional right to same-sex marriage, or that any fundamental right to marry includes same-sex couples.  Fundamental rights are "objectively, deeply rooted in this Nation's history and tradition . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."  *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal quotations and citations omitted).  A "careful description of the asserted fundamental liberty interest" is required, and courts must "exercise the utmost care whenever [they] are asked to break new ground in this field . . . ."  *Id.* (internal quotations and citations omitted).

"Marriage" is a foundational and ancient social institution whose meaning, until recently, was universally understood as limited to the union of a man and a woman. *Windsor*, 133 S. Ct. at 2689.  Plaintiffs cannot assert a fundamental right to "marriage" because same-sex couples plainly fall outside the scope of the right itself, unlike the opposite-sex couples.  That is why, a mere five years after *Loving v. Virginia*, 388 U.S. 1 (1967), the Supreme Court rejected a constitutional same-sex marriage claim as failing even to present a "substantial federal question." *Baker v. Nelson*, 409 U.S. 810, 810 (1972).

Furthermore, no separate fundamental right to "same-sex marriage" is "deeply rooted in this Nation's history and tradition . . . and implicit in the concept of ordered liberty." *Glucksberg*, 521 U.S. at 720-21.  Barely a decade ago, in 2003, Massachusetts became the first State to extend the definition of marriage to same-sex couples.  It did so through a 4-3 court decision, without a majority opinion, by interpreting its state constitution. *Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941, 969 (Mass. 2003).  Other state supreme courts followed suit, *see Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407, 482 (Conn. 2008), *Varnum v. Brien*, 763 N.W.2d 862, 906 (Iowa 2009), but only twelve States and the District of Columbia have extended marriage to same-sex unions legislatively, the first not occurring until 2009. *See* Conn. Gen. Stat. §§ 46b-20, -20-a.

Same-sex marriage cannot be transformed into a fundamental right by repackaging marriage as the freedom to select the partner of one's choosing. *See Jackson v. Abercrombie*, 884 F. Supp. 2d 1065, 1095 (D. Haw. 2012) ("[M]issing from Plaintiffs' asserted 'right to marry the person of one's choice' is its centerpiece: the right to marry someone of the same gender.").  Divining a "right to make a public commitment to form an exclusive relationship and create a family with a partner with whom the person shares an intimate and sustaining emotional bond,"

*Bostic*, 2014 WL 561978, at *12, plainly fails to meet the "careful description of the asserted fundamental liberty interest" rule.  *Glucksberg*, 521 U.S. at 720-21.  Declaring that same-sex marriage claimants seek "nothing more than to exercise a right that is enjoyed by the vast majority of Virginia's adult citizens," *Bostic*, 2014 WL 561978, at *12, leaves out the only part of the asserted right that matters: that the claimants seek this right as same-sex couples.  The asserted interest, properly defined, is the right to state-sanctioned marriage for a same-sex couple—not the right to "marriage" redefined by *fiat*.  Same-sex marriage is not a fundamental right—as the Supreme Court itself indicated in *Windsor*, 133 S. Ct. at 2689.

> **b.** **Limiting marriage to the union of a man and a woman   does not implicate a suspect class**

The traditional definition of marriage existed at the very origin of the institution and predates by millennia the current political controversy over same-sex marriage.  It neither targets nor disparately impacts either sex, nor does it classify based on sexual orientation.  Accordingly, there is no basis for subjecting traditional marriage definitions to heightened scrutiny.

> **i.** **Traditional marriage does not discriminate based on sex**

The traditional definition of marriage draws no distinction based on sex.  As the court observed in *Sevcik*, 911 F. Supp. 2d at 1005, laws protecting traditional marriage "are not directed toward persons of any particular gender, nor do they affect people of any particular gender disproportionately such that a gender-based animus can reasonably be perceived."  *See also, e.g.*, *Bishop v. United States ex rel. Holder*, 962 F. Supp. 2d 1252, 1286 (N.D. Okla. 2014) (Oklahoma's Marriage Protection Amendment "does not draw any distinctions between same-sex male couples and same-sex female couples, does not place any disproportionate burdens on men and women, and does not draw upon stereotypes applicable only to male or female couples."); *Jackson*, 884 F. Supp. 2d at 1098-99 ("agree[ing] with the vast majority of courts

considering the issue that an opposite-sex definition of marriage does not constitute gender discrimination") (listing cases).

Accordingly, there is no parallel to *Loving v. Virginia*, 388 U.S. 1 (1967), because race and sex are not constitutionally fungible concepts. *See Hernandez v. Robles*, 805 N.Y.S.2d 354, 371 (N.Y. App. Div. 2005) (Catterson, J., concurring) ("To elevate the issue of same sex unions to that of discrimination on the basis of race does little service to the legacy of the civil rights movement, and ignores the history of race relations in this country."). Anti-miscegenation laws were "designed to maintain White Supremacy." *See Loving*, 388 U.S. at 11. A *Loving* analogy involving sex discrimination would, for example, ban *only* lesbians from marrying women, but not gay men from marrying other men. That is plainly not the case here, where men and women are equally affected by Indiana's traditional marriage definition.

### ii. Traditional marriage does not discriminate based on sexual orientation

Furthermore, traditional marriage laws in no way target homosexuals as such. With traditional marriage, "the distinction is not by its own terms drawn according to sexual orientation. Homosexual persons may marry . . . but like heterosexual persons, they may not marry members of the same sex." *Sevcik*, 911 F. Supp. 2d at 1004. While traditional marriage laws *impact* heterosexuals and homosexuals differently, they do not create classifications based on sexuality, particularly considering the benign history of traditional marriage laws generally. *See, e.g.*, *Washington v. Davis*, 426 U.S. 229, 242 (1976) (holding that disparate impact on a suspect class is insufficient to justify strict scrutiny absent evidence of discriminatory purpose). And when a facially neutral statute is challenged on equal protection grounds, the plaintiff must show that "a state legislatur[e] . . . selected or reaffirmed a particular course of action *at least in part because of, not merely in spite of,* its adverse effects [on] an identifiable group." *Pers.*

*Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279 (1979) (emphasis added) (internal quotation marks omitted).

Plaintiffs assert, with no evidence, that Indiana Code Section 31-11-1-1 "was motivated by animus against homosexuals." Pls.' Prelim. Inj. Mem. at 18. There is no legislative history or other evidence supporting such calumny. The rationale for the 1997 legislation was far more likely related to preserving the State's ability to define marriage following the Hawaii Supreme Court's 1993 decision calling traditional marriage law into question in *Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993). *See The History of Indiana Law* 80 (David J. Bodenhamer & Randall T. Shepard eds., 2006).

Besides, the validity of Indiana's traditional marriage definition must turn on whether such laws are generally permissible, not on local motivations. And there is no plausible argument that the traditional definition of marriage was invented as a way to discriminate against homosexuals. Indeed, in *Lawrence*, the Court examined only the past fifty years for the history of laws directed at homosexuals because "there is no longstanding history in this country of laws directed at homosexual conduct as a distinct matter." *Lawrence v. Texas*, 539 U.S. 558, 568 (2003). Implicit in this statement is an acknowledgement that traditional marriage is *not* "law[] directed at homosexual conduct as a distinct matter."

On this score, there is again no appropriate comparison with *Loving*. Unlike traditional marriage laws, antimiscegenation laws *contravened* common law and marriage tradition in Western society. The entire phenomenon of banning interracial marriages originated in the American colonies: "[T]here was no ban on miscegenation at common law or by statute in England at the time of the establishment of the American Colonies." Harvey M. Applebaum, *Miscegenation Statutes: A Constitutional and Social Problem*, 53 Geo. L.J. 49, 49-50 (1964).

*Loving*, in short, invalidated efforts to thwart the traditional parameters of marriage (which took no account of race) based on racial animus.  It involved relationships that were plainly within the historical understanding and purposes of marriage.  In contrast, same-sex relationships were never thought to be marriages—or to further the purposes of marriage—anywhere at any time, until recently (in some jurisdictions).  Accordingly, there is no basis for inferring that group animus underlies traditional marriage.

Regardless, the Supreme Court has never held that sexual orientation constitutes a suspect class, and the law in this circuit, as well as most others, is that homosexual persons do *not* constitute a suspect class.  *See Schroeder v. Hamilton Sch. Dist.*, 282 F.3d 946, 953-54 (7th Cir. 2002) ("[H]omosexuals are not entitled to any heightened protection under the Constitution."); *see also Cook v. Gates*, 528 F.3d 42, 61 (1st Cir. 2008); *Veney v. Wyche*, 293 F.3d 726, 731-32 (4th Cir. 2002); *Baker v. Wade*, 769 F.2d 289, 292 (5th Cir. 1985) (en banc); *Equal. Found. of Greater Cincinnati, Inc. v. City of Cincinnati*, 128 F.3d 289, 294 (6th Cir. 1997); *Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 866-67 (8th Cir. 2006); *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1113-14 & n.9 (10th Cir. 2008); *Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 818 (11th Cir. 2004); *Steffan v. Perry*, 41 F.3d 677, 684 n.3 (D.C. Cir. 1994) (en banc); *Woodward v. United States*, 871 F.2d 1068, 1076 (Fed. Cir. 1989); *see also Romer v. Evans*, 517 U.S. 620, 631-35 (1996) (applying rational basis scrutiny to classification based on sexual orientation).  *But see SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 481 (9th Cir. 2014) (applying heightened scrutiny to juror challenges based on sexual orientation; subject to a *sua sponte* en banc call).

Neither *Windsor*, nor *Romer*, nor *Lawrence*, supports heightened scrutiny for legislation governing marriage.  *Romer* expressly applied rational basis scrutiny, while *Lawrence* and

41

*Windsor* implied the same.  *Romer,* 517 U.S. at 631-32; *Lawrence,* 539 U.S. at 578; *Windsor,* 133 S. Ct. at 2696.  In *Windsor* the Court invalidated Section 3 of DOMA as an "unusual deviation from the usual tradition of *recognizing and accepting state definitions of marriage*[,]" 133 S. Ct. at 2693 (emphasis added), which required analyzing whether DOMA was motivated by improper animus.  It ruled that "no legitimate purpose"—a hallmark of rational basis review—justified the law.  *Id.* at 2696.  There is nothing about a State's centuries-old traditional definition of marriage that either targets sexual orientation or constitutes an "unusual deviation from tradition."

Plaintiffs claim that sexual orientation—the supposed basis for discrimination—"is now widely recognized as [an] 'immutable'" characteristic triggering heightened scrutiny, but nearly in the same breath negate that assertion by quoting an amicus brief saying that sexual orientation is merely "highly resistant to change."  *See* Pls.' Prelim. Inj. Br. at 9.  Regardless, the Supreme Court, in *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985), cautioned that suspect-class status is inappropriate "where individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement."  *Id.* at 441-42.  The distinguishing characteristic with respect to same-sex couples is their inability to procreate (as a couple).  As explained in more detail in Part II.C.3.a., *infra*, the general capacity of opposite-sex couples to procreate through sexual activity—especially unintentionally—gives rise to State interests in marriage.  This distinction erodes any claim that homosexuals constitute a suspect class vis-à-vis traditional marriage laws.

Finally, suspect class status is reserved for groups that are "politically powerless in the sense that they have no ability to attract the attention of the lawmakers."  *Cleburne*, 473 U.S. at 445.  Plaintiffs cannot credibly claim that homosexuals as a class are "'politically powerless' to

prevent discrimination by the majority through legislative means."  Pls.' Prelim. Inj. Mem. at 9.
Just this winter, Indiana's lawmakers, having passed once already a resolution to enshrine the
traditional definition of marriage in the Indiana Constitution, and nearing a vote to put the
measure to statewide referendum in November 2014, effectively started the process over and
killed the measure for this year.  Tony Cook & Barb Berggoetz, *Same-Sex Marriage Ban Won't
Be on November Ballot*, The Indianapolis Star (Feb. 14, 2014), *available at*
http://www.indystar.com/story/news/politics/2014/02/13/hjr-3-last-minute-maneuver-could-
spare-2nd-sentence-/5455299/.   This is far from the only political victory advocates for
homosexual rights have scored in recent years; it is only the most dramatic close to home.  *See*
Morgan Little, *Gay Marriage Movement Wins Significant Victories in 2013*, LA Times (Dec. 9,
2013),  *available  at*  http://www.latimes.com/nation/nationnow/la-pn-gay-marriage-movement-
gains-2013-20131206,0,1888807.story#axzz2zdVzLoIA  (summarizing  legislative  and  judicial
victories of 2013 and stating that "the gay rights movement as a whole is only becoming more
popular nationwide, leading many to speculate that it's the fastest moving civil rights movement
in U.S. history").

National  success  persuading  voters  and  lawmakers  to  provide  for  same-sex  marriage—
the very issue over which plaintiffs claim protected status—confirms the sort of political clout
that prevents recognition of homosexuals as a suspect class.  *Cf.* Frank Bruni, *The New Gay
Orthodoxy*, N.Y. Times, Apr. 5, 2014, *available at* http://www.nytimes.com/2014/04/06/opinion/
sunday/bruni-the-new-gay-orthodoxy.html (claiming that "the debate is essentially over, in the
sense that the trajectory is immutable and the conclusion foregone[:] The legalization of same-
sex marriage from north to south and coast to coast is merely a matter of time, probably not
much of it at that").

### 3.      Traditional marriage satisfies constitutional review

Because no fundamental rights or suspect classes are implicated, the proper test under the federal due process and equal protection clauses is rational basis review.  Courts must examine the issue from the State's perspective, not the challenger's perspective.

In particular, this means that the State may justify limits on government benefits and burdens by reference to whether *including* additional groups would accomplish the government's underlying objectives.  *Johnson v. Robinson*, 415 U.S. 361, 383 (1974) ("When . . . the inclusion of one group promotes a legitimate governmental purpose, and the addition of other groups would not, we cannot say that the statute's classification of beneficiaries and nonbeneficiaries is invidiously discriminatory.").  This framework accords with the longstanding principle that "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same," *Tigner v. Texas*, 310 U.S. 141, 147 (1940), and, therefore, "where a group possesses distinguishing characteristics relevant to interests the State has the authority to implement, a State's decision to act on the basis of those differences does not give rise to a constitutional violation."  *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366-67 (2001) (internal quotations and citation omitted).  *See also Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.").

Accordingly, the proper constitutional question has nothing to do with justifications for "excluding" access to marriage and its benefits—an inquiry that inherently presupposes the existence of a right to such "access" and thereby amounts to a *rejection* of rational-basis review. Rather, "the relevant question is whether an opposite-sex definition of marriage furthers

44

legitimate interests that would not be furthered, or furthered to the same degree, by allowing same-sex couples to marry." *Jackson*, 884 F. Supp. 2d at 1107; *Andersen v. King Cnty.*, 138 P.3d 963, 984 (Wash. 2006) (en banc); *Morrison v. Sadler*, 821 N.E.2d 15, 23 (Ind. Ct. App. 2005); *Standhardt v. Superior Court ex rel. Cnty. of Maricopa*, 77 P.3d 451, 463 (Ariz. Ct. App. 2003).

The State has no greater burden to justify its decision not to license or recognize same-sex marriages than it has to justify refusing benefits to *any* group.  Again, the motivations behind any particular perpetuation of the status quo (evidence of which does not exist in any event) are irrelevant.  *Cf. Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 653-54 (7th Cir. 2013) (explaining that "under rational basis review, [courts] cannot search for the legislature's motive [because a]ll that matters is whether the statute, as written, furthers a legitimate government objective").  *Windsor* does not permit inquiry into motivations because there is no departure here from the usual course. *See* Part II.C.1.*, supra*.  It need only articulate reasons to confer benefits on opposite-sex couples that do not apply to same-sex couples.  The exclusive capacity and tendency of heterosexual intercourse to produce children, and the State's need to ensure that those children are cared for, provide those reasons.

### a.  States recognize opposite-sex marriages to encourage responsible procreation, and this rationale does not apply to same-sex couples

Civil marriage recognition exists for important reasons having nothing to do with same-sex couples.  It arises from the need to protect the only procreative sexual relationship that exists and to make it more likely that unintended children, among the weakest members of society, will be cared for.  *See Morrison*, 821 N.E.2d at 15, 29 (marriage exists "to encourage responsible procreation by opposite-sex couples"); *id.* at 25 ("The institution of marriage not only encourages opposite-sex couples to form a relatively stable environment for the 'natural'

45

procreation of children in the first place, but it also encourages them to stay together and raise a child or children together if there is a 'change in plans.'"").  This analysis is dominant in our legal system and should continue to carry the day.[3]

Traditional marriage protects a norm where sexual activity that *can* beget children should occur in a long-term, cohabitive relationship.  *See, e.g., Hernandez v. Robles,* 855 N.E.2d 1, 7 (N.Y. 2006) ("The Legislature could rationally believe that it is better, other things being equal, for children to grow up with both a mother and a father.").  It provides the opportunity for children born within it to have a biological relationship to those having original *legal* responsibility for their well-being, and accordingly is the institution that provides the greatest likelihood that both biological parents will nurture and raise the children they beget.  States have a strong interest in supporting and encouraging this norm.

Unlike opposite-sex couples, the sexual activity of same-sex couples implies no unintentional pregnancies.  Whether through surrogacy or reproductive technology, same-sex couples can become biological parents only by deliberately choosing to do so, requiring a serious investment of time, attention, and resources.  *Morrison,* 821 N.E.2d at 24.  Consequently, same-sex couples do not present the same potential for unintended children, and the State does not necessarily have the same need to provide such parents with the incentives of marriage.  *Id.* at 25; *see also In re Marriage of J.B. & H.B.*, 326 S.W.3d 654, 677 (Tex. Ct. App. 2010) ("Because

---

[3] *See Citizens for Equal Protection v. Bruning,* 455 F.3d 859, 867 (8th Cir. 2006); *Lofton v. Sec'y of the Dep't of Children and Family Servs.*, 358 F.3d 804, 818-19 (11th Cir. 2004); *Sevcik v. Sandoval,* 911 F. Supp. 2d 996, 1015-16 (D. Nev. 2012); *Jackson v. Abercrombie,* 884 F. Supp. 2d 1065, 1112-13 (D. Haw. 2012); *Smelt v. County of Orange,* 374 F. Supp. 2d 861, 880 (C.D. Cal. 2005), *aff'd in part, vacated in part,* 477 F.3d 673 (9th Cir. 2006); *Wilson v. Ake,* 354 F. Supp. 2d 1298, 1309 (M.D. Fla. 2005); *In re Kandu,* 315 B.R. 123, 147-48 (Bankr. W.D. Wash. 2004); *Adams v. Howerton,* 486 F. Supp. 1119, 1124 (C.D. Cal. 1980), *aff'd* 673 F.2d 1036 (9th Cir. 1982); *In re Marriage of J.B. & H.B.*, 326 S.W.3d 654, 677-78 (Tex. App. 2010); *Conaway v. Deane,* 932 A.2d 571, 619-21, 630-31 (Md. 2007); *Hernandez v. Robles,* 855 N.E.2d 1, 7 (N.Y. 2006); *Andersen v. King County,* 138 P.3d 963, 982-83 (Wash. 2006) (en banc); *Standhardt v. Superior Court,* 77 P.3d 451, 463-65 (Ariz. Ct. App. 2003); *Dean v. District of Columbia,* 653 A.2d 307, 337 (D.C. 1995); *Singer v. Hara,* 522 P.2d 1187, 1195 (Wash. Ct. App. 1974); *Baker v. Nelson,* 191 N.W.2d 185, 186 (Minn. 1971).

only relationships between opposite-sex couples can naturally produce children, it is reasonable for the state to afford unique legal recognition to that particular social unit in the form of opposite-sex marriage.").

The fact that non-procreating opposite-sex couples may marry does not undermine marriage as the optimal procreative context.  Opposite-sex couples without children who are married model the optimal, socially expected behavior for other opposite-sex couples whose sexual intercourse may well produce children.  *See Morrison*, 821 N.E.2d at 27 ("There was a rational basis for the legislature to draw the line between opposite-sex couples, who as a generic group are biologically capable of reproducing, and same-sex couples, who are not.  This is true, regardless of whether there are some opposite-sex couples that wish to marry but one or both partners are physically incapable of reproducing."); *see also Singer v. Hara*, 522 P.2d 1187, 1195 (Wash. Ct. App. 1974) (confirming marriage "as a protected legal institution primarily because of societal values associated with the propagation of the human race[]" "even though married couples are not required to become parents and even though some couples are incapable of becoming parents and even though not all couples who produce children are married").

Moreover, inquiring of every applicant for a marriage license whether they can or intend to procreate would impose serious, constitutionally questionable intrusions on individual privacy. The State is not required to go to such extremes simply to prove that the purpose of marriage is to promote procreation and child rearing in the traditional family context.  It suffices to observe that only members of the opposite sex have even a chance at procreating, so it is fair to limit marriage to opposite-sex unions as an initial matter, regardless of further regulations of marriage.

The State may prefer childrearing by biological parents, "whom our society . . . [has] always presumed to be the preferred and primary custodians of their minor children." *Reno v.*

*Flores*, 507 U.S. 292, 310 (1993).  But that does not mean it must foreclose all other parenting scenarios by outlawing adoptions or otherwise preventing parents from raising children to whom they are not biologically related.[4]  The State's interest in ensuring that children are properly cared for may take many forms, the fundamental one being traditional marriage.  And the mere ability of same-sex couples to become parents does not put such couples on the same footing as opposite-sex couples, whose general ability to procreate, especially unintentionally, legitimately gives rise to state policies encouraging the legal union of such sexual partners.  *Morrison*, 821 N.E.2d at 25 ("[T]he legislative classification of extending marriage benefits to opposite-sex couples but not same-sex couples is reasonably related to a clearly identifiable, inherent characteristic that distinguishes the two classes: the ability or inability to procreate by 'natural' means.").  Parental rights are an important aspect of traditional marriage, but it does not follow that marriage rights go wherever parental rights lead.  The purpose of traditional marriage is not to encourage just *any* two people who could be good parents to assume parental responsibilities.  It is instead to encourage the two *biological* parents to care for their children in tandem.  Neither same-sex couples nor any other inherently non-procreative grouping fits that bill.

> **b.    Many courts have rejected the theory that traditional marriage is about homosexual animus**

Plaintiffs posit that traditional marriage is about harming homosexuals.  Pls.' Prelim. Inj. Mem. at 18.  But as Justice O'Connor wrote in her concurrence in *Lawrence*, legitimate state interests, such as "preserving the traditional institution of marriage," "exist to promote the institution of marriage beyond mere moral disapproval of an excluded group."  *Lawrence v. Texas*, 539 U.S. 558, 585 (2003) (O'Connor, J., concurring).

---

[4] Indeed, Plaintiffs' assertion that "[f]or same-sex families moving to Indiana, parental rights are nullified without a modicum of due process," Pls.' Prelim. Inj. Mem. at 15, is simply false.  Indiana recognizes the adoption decrees of other States and Plaintiffs cite no authority to the contrary.  *See id.*

Traditional marriage is not about sending a "message," Pls.' Prelim. Inj. Mem. at 22-23, concerning homosexuality or the status of homosexuals.  It is about biology, about regulating sexual relationships that create children that must be cared for.  No amount of modern thinking about male and female roles can change these facts of life.  Accordingly, many state and federal courts have expressly rejected the theory that restricting marriage to opposite-sex couples evinces unconstitutional animus toward homosexuals as a group. The plurality in *Hernandez*, 855 N.E.2d at 8, observed that "the traditional definition of marriage is not merely a by-product of historical injustice. Its history is of a different kind."  As those judges explained, "[t]he idea that same-sex marriage is even possible is a relatively new one. Until a few decades ago, it was an accepted truth for almost everyone who ever lived, in any society in which marriage existed, that there could be marriages only between participants of different sex.  A court should not lightly conclude that everyone who held this belief was irrational, ignorant or bigoted." *Id. See also Standhardt*, 77 P.3d at 465 ("Arizona's prohibition of same-sex marriages furthers a proper legislative end and was not enacted simply to make same-sex couples unequal to everyone else."); *In re Marriage of J.B. & H.B.*, 326 S.W.3d at 680 (rejecting argument that Texas laws limiting marriage and divorce to opposite-sex couples "are explicable only by class-based animus").  Indeed, *all* courts upholding traditional marriage definitions at least tacitly reject the theory that homosexual animus is at work.  *See* Part II.C.3.a., *supra*.

### 4.    No other limiting principle for marriage rights is apparent

In its Temporary Restraining Order in the related case *Baskin v. Bogan*, No. 1:14-cv-355-RLY-TAB, the Court commented that the State's responsible procreation rationale for civil marriage "cannot be the entire rationale underlying the traditional marriage[, and, a]dditionally, this philosophy is problematic in that the state of Indiana generally recognizes marriages of

individuals who cannot procreate."  Entry on Pls.' Mot. for TRO at 7, *Baskin v. Bogan*, No. 1:14-cv-355-RLY-TAB (S.D. Ind. Apr. 18, 2014).  With respect, however, it remains the case that the vast majority of courts to address the issue have been persuaded that the purpose of marriage is exactly that.  Only since the Supreme Court's decision in *Windsor* have courts regularly begun to question that premise, yet *Windsor* neither addressed this theory nor altered history.  Even more important, neither Plaintiffs nor judicial decisions invalidating traditional marriage definitions offer meaningful alternative rationales or definitions.  For example, the *Bostic* court declared that any "public commitment to form an exclusive relationship and create a family with a partner with whom the person shares an intimate and sustaining emotional bond" is entitled to marriage recognition.  *Bostic*, 2014 WL 561978, at *12.  This proposal for redefinition, however, in no way explains why government has any interest in recognizing marriage or in regulating *sexual* relationships.  The district court in *Bostic* spoke of "an intimate and sustaining emotional bond," but never said why that matters to the State.

Such an omission is glaring and significant.  If the desire for social recognition and validation of self-defined "intimate" relationships are the bases for civil marriage, no adult relationships can be excluded *a priori* from making claims upon the government for recognition.

A central argument for recognizing same-sex marriages arises from a fashionable insistence that the "modern family" is not what it used to be.  Indeed, there seems to be no end to the variety of *de facto* family permutations that can arise.  By virtue of statutory amendment and judicial fiat, some states bestow parental rights and responsibilities even on entire groups of "co-parents."   In recent years, Delaware and the District of Columbia have passed laws that recognize third "de facto" parents who have parental rights and responsibilities.  D.C. Code §§ 16-831.01 *et seq.*; 13 Del. Code § 8-201.  Courts in several other states have also recognized

three parents.  *See In re Parentage of L.B.*, 122 P.3d 161, 176-77 (Wash. 2005) (*en banc*) (recognizing third "de facto" parent); *C.E.W. v. D.E.W.*, 845 A.2d 1146 (Me. 2004) (same); *V.C. v. M.J.B.*, 748 A.2d 539 (N.J. 2000) (recognizing third "psychological" parent); *LaChappelle v. Mitten*, 607 N.W.2d 151 (Minn. Ct. App. 2000) (recognizing third-parent rights); *see also In re M.C.*, 195 Cal. App. 4th 197, 214, 223 (2011) (observing that "M.C. does have three presumed parents, a situation the Supreme Court has acknowledged may exist," but remanding for reconciliation of competing parentage claims).[5]

But none of these social changes—whether one views them as good, bad, or inconsequential—justifies marriage for same-sex couples.  Surely no one argues that the liberty of adults to engage freely in consensual sex means States must also celebrate (or even acknowledge) each individual's sexuality.  Nor, then, does the government's interest in the sexuality of its citizens suddenly spring forth at the origination of particular romantic or cohabitational relationships as such.  There has to be something more to justify government involvement.  *See* Willystine Goodsell, *A History of the Family as a Social and Educational Institution* 7 (The Macmillan Company 1915) ("It seems clear enough that the sexual instinct of itself could not have brought about permanent relationships between male and female.").

For qualified opposite-sex couples, the "something more" is the natural capacity of their relationship to produce children unintentionally.  This natural capacity gives rise to the state's interest in encouraging responsible procreation, *i.e.*, where the sexual partners live in a long-term, committed relationship for the sake of any children they may produce, even

---

[5] Still more States' courts have conferred joint parental rights on unmarried same-sex couples in circumstances that would imply the availability of third-parent rights.  *See Raftopol v. Ramey*, 12 A.3d 783, 799 (Conn. 2011) (recognizing paternal rights in both biological father and gay partner, parties to gestational agreement with maternal surrogate); *K.M. v. E.G.*, 37 Cal. 4th 130, 142-44 (2005) (recognizing maternal rights in both egg-donor mother and birth mother); *T.M.H. v. D.M.T.*, 79 So.3d 787, 803 (Fla. Dist. Ct. App. 2011) (holding it constitutionally mandated that both egg-donor mother and birth mother have parental rights); *see also* Melanie B. Jacobs, *Why Just Two? Disaggregating Traditional Parental Rights and Responsibilities to Recognize Multiple Parents*, 9 J.L. & Fam. Stud. 309 (2007).

unintentionally.  *See id.* at 7-8 ("The source of marriage . . . must probably be looked for in the utter helplessness of the newborn offspring . . . ."). The ability of same-sex couples to raise children together is not the same thing.  The primary rationale for traditional marriage is responsible *procreation*, not responsible parenting more generally.  Hence, what is missing is society's interest in encouraging couples to consider and plan for the children that inevitably result from impulsive decisions to act on sexual desires.  The sexual activity of same-sex couples implies no consequences similar to that of opposite-sex couples.

It is no response for same-sex couples to say that the State *also* has an interest in encouraging those who acquire parental rights without procreating (together) to maintain long-term, committed relationships for the sake of their children.  Such an interest is not the same as the interest that justifies marriage as a special status for sexual partners *as such*.  Traditional marriage reflects the ideal of family life, recognizing the love between a mother and a father *and the ability of this relationship to bear children*.  The same is true for opposite-sex couples that do not procreate because they model the optimal ordering of family life.  Responsible *parenting* is not a theory supporting marriage for same-sex couples because it cannot answer two critical questions: Why two people?  Why a sexual relationship?

In other words, if marriage rights must follow parental rights, and if States cannot restrict *joint* parental rights to opposite-sex couples as an optimal setting for childrearing, there would be no basis for precluding joint parentage—and, hence, marriage—by *any* social grouping, regardless of the existence of a sexual relationship.  Sisters, brothers, platonic friends, groups of three or more—all would be on equal footing for purposes of the right to parent jointly and, thus, the right to marry.[6]  Consequently, responsible *parenting* is not a justification for same-sex-

---

[6] In this regard it is important to bear in mind that, under this model, it is only the *potential* for a group of adults to acquire parental rights—not the *actual* conferral of parental rights on any particular grouping—that would be the

couple marriage, as distinguished from recognition of any other human relationships. It is instead a rationale for eliminating marriage as government recognition of a *limited* set of relationships. Once the natural limits that inhere in the relationship between a man and a woman can no longer sustain the definition of marriage, the conclusion that follows is that any grouping of adults would have an equal claim to marriage. *See, e.g.*, Jonathan Turley, *One Big, Happy Polygamous Family*, NY Times, July 21, 2011, at A27 ("[Polygamists] want to be allowed to create a loving family according to the values of their faith.").

Marriage is not a device traditionally used to acknowledge acceptable sexuality, living arrangements, or parenting structures. It is a means to encourage and preserve something far more compelling and precise: the relationship between a man and a woman in their natural capacity to have children. It attracts and then regulates couples whose sexual conduct may create children in order to ameliorate the burdens society ultimately bears when unintended children are not properly cared for. Neither same-sex couples nor any other social grouping presents the same need for government involvement, so there is no similar rationale for recognizing them.

**D.    Traditional marriage does not impinge on the right to freedom of association**

**1.    Freedom of association is subsumed within due process**

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984), recognized a constitutionally protected "freedom of association" rooted in the Due Process Clause and the First Amendment. *Id.* at 617-18. The right includes both intimate and expressive association, but only the former, *i.e*, "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State," *id.* at 617-18, plausibly arises here. Yet there is no state

---

necessary predicate for marriage. In other words, taken to its logical conclusion, Plaintiffs' argument for "marriage equality" would insist that, just as opposite-sex couples are eligible for marriage by reference to their *theoretical* procreative capacity, so too would other groups be eligible for marriage by reference to *their* theoretical ability to acquire joint parental rights, regardless whether they actually (or even intend) to do so.

"intrusion" into private affairs, so this claim offers nothing beyond the claim that substantive due process grants a fundamental right of same-sex marriage. *See Montgomery v. Carr*, 101 F.3d 1117, 1131 (6th Cir. 1996) ("[S]tate action impinging on the right to marry is to be reviewed in the same fashion whether advanced on the theory that it violates substantive due process or advanced on the theory that it violates the First Amendment's right to intimate association."). So, for the reasons set forth in Part II.B.3., *supra*, the freedom of association claims also must fail.

### 2. Indiana's traditional marriage definition is not a "direct and substantial burden" on Plaintiffs' rights

Indiana law does not restrain the Plaintiff couples from interacting as a couple, holding themselves out to be a couple, getting married in other jurisdictions, adopting, *see* Dale Aff. ¶ 6; Uebelhoer Aff. ¶ 6; Kohorst Aff. ¶ 5, or from participating in other activities that make up "the freedom to enter into and carry on certain intimate or private relationships[.]" *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987). Plaintiffs want more than non-interference, however; they desire official recognition of their relationship as a marriage. Freedom of association, under either a substantive due process claim or a First Amendment claim, does not reach that far because the right to marriage has never included a right to same-sex marriage. *See* Part II.C.2.a., *supra*. Same-sex marriage is a contemporary construct that fails to advance Indiana's interest in traditional marriage—*e.g.*, the promotion of responsible procreation—which the *Roberts* Court implicitly approved by emphasizing relationships that "attend the creation and sustenance of a family . . . ; childbirth . . . ; [and] the raising and education of children[.]" *Roberts*, 468 U.S. at 619. The traditional definition of marriage therefore does not harm Plaintiffs' freedom to associate with their partners.

The cases Plaintiffs cite are inapposite because they do not scrutinize same-sex relationships and, more generally, involve deprivation of some job or property as a consequence of association, not refusal to grant positive rights as endorsement of that association.  *See Parks v. City of Warner Robins*, 43 F.3d 609, 611-12 (11th Cir. 1995) (City's anti-nepotism policy dictated that less-senior police sergeant would forfeit her job if she married her supervising Captain); *Via v. Taylor*, 224 F. Supp. 2d 753, 757 (D. Del. 2002) (prison correctional officer terminated as consequence of her off-duty relationship with paroled former inmate); *Wolford v. Angelone*, 38 F. Supp. 2d 452, 454 (W.D. Va. 1999) (police officer fired after marrying an inmate); *Briggs v. N. Muskegon Police Dep't*, 563 F. Supp. 585, 586-87 (W.D. Mich. 1983) (part-time city police officer terminated for cohabitating with a married woman who was not his wife); *Cross v. Baltimore City Police Dep't*, 73 A.3d 1186, 1187-88 (Md. Ct. Spec. App. 2013) (Baltimore City Police Department fired police officer after she married an inmate).  These cases are not about bestowing government recognition or a particular status upon the couples involved.

Second, even if Indiana's traditional marriage definition can somehow be construed to "impede" Plaintiffs' intimate association, it is judged under rational basis review, not strict scrutiny, and is rationally related to the State's legitimate interest in responsible procreation.  *See* Part II.C.3.a., *supra*.  *Roberts* (and *Zablocki*) "establishes a two-part inquiry: if the challenged policy imposes a direct and substantial burden on an intimate relationship, it is subject to strict scrutiny; if the policy does not impose a direct and substantial burden, it is subject only to rational basis review."  *Montgomery v. Stefaniak*, 410 F.3d 933, 938 (7th Cir. 2005).  As the Eighth Circuit held in *Citizens for Equal Protection v. Bruning*, 455 F.3d 859 (8th Cir. 2006), a prohibition on same-sex marriage does not violate the First Amendment right to freedom of association "because [] it does not directly and substantially interfere with [plaintiffs'] ability to

associate in lawful pursuit of a common goal, and [] it seems exceedingly unlikely it will prevent persons from continuing to associate." *Id*. at 870 (internal quotation marks omitted).  Indiana's marriage law should withstand challenge under the First Amendment for these same reasons.

> **E.   Traditional marriage does not implicate the right to travel**

Indiana's marriage laws do not implicate any "right to travel" because they treat residents and non-residents exactly the same: neither may marry a person of the same sex in Indiana.  Such a uniformly applicable law has never been struck down by the Supreme Court as a violation of the right to travel, which comprises three components: "It protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Saenz v. Roe*, 526 U.S. 489, 500-02 (1999) (clarifying that the second component is based on U.S. Const. art. IV, § 2, and provides that "a citizen of one State who travels in other States, intending to return home at the end of his journey, is entitled to enjoy the 'Privileges and Immunities of Citizens in the several States' that he visits").

Any argument based on the first component is easily dismissed because the Indiana's Defense of Marriage Act cannot reasonably be read to prevent a same-sex couple from entering or leaving Indiana.  A non-discriminatory law like this also cannot violate the second and third components because their touchstone is equality between residents and non-residents.  *See Zobel v. Williams*, 457 U.S. 55, 60 n.6 (1982) ("In reality, right to travel analysis refers to little more than a particular application of equal protection analysis [of] state distinctions between newcomers and longer term residents."); *Paul v. Virginia*, 75 U.S. 168, 180 (1868), *overruled in part on other grounds by United States v. South-Eastern Underwriters Ass'n.,* 322 U.S. 533

(1944)  (explaining that the right to travel "inhibits discriminating legislation against [non-residents] by other States; . . . it insures to [non-residents] in other States the same freedom possessed by the citizens of those States in the acquisition and enjoyment of property and in the pursuit of happiness; and it secures to [non-residents] in other States the equal protection of their laws." Accordingly, only discriminatory laws have been invalidated by the Supreme Court.  *See, e.g.*, *Saenz*, 526 U.S. at 492 (limits on welfare benefits for new residents); *Zobel*, 457 U.S. at 56 (income distribution based on length of residence); *Mem'l Hosp. v. Maricopa County*, 415 U.S. 250, 251 (1974) (requiring year's residence to receive free nonemergency medical care).

Under Indiana Code Section 31-11-1-1, both residents and non-residents are prohibited from entering into same-sex marriages in Indiana and, if they are married in another state, their same-sex marriages are not recognized.  Regardless of the merits of the law, its neutral application will be upset if Plaintiffs' requests for an exception are granted.  *See* Dale Aff. ¶ 16 (asking for recognition of her Massachusetts marriage so that she will not have to travel "with a full range of legal documents"); Uebelhoer Aff. ¶ 14 (same); Kohorst Aff. ¶ 17 (asking for recognition of her New York marriage so that she will not have to "take [her] paperwork for [her] son's guardianship as well as [her and her partner's] POAs" while traveling).  Recognizing couples who were married in other States would "give[ them] benefits superior to those enjoyed by other [Indiana] residents," and "[the] Court has never held that the constitutional right to travel embraces any such doctrine[.]"  *Califano v. Gautier Torres*, 435 U.S. 1, 4 (1978).

Such preferential treatment would in fact "bid fair to destroy the independent power of each State under our Constitution to enact laws uniformly applicable to all of its residents."  *Id.* at 4-5.  Each State would be in thrall to laws enacted in other jurisdictions, robbing of all meaning the Court's recent declaration that "[b]y history and tradition the definition and

57

regulation of marriage . . . has been treated as being within the authority and realm of the *separate* States." *Windsor*, 133 S. Ct. at 2689-90 (emphasis added).  Plaintiffs may not use the right to travel as a "Blue Highway" for other States to define marriage in Indiana.

### F.     Traditional marriage does not implicate the Establishment Clause

Among many problems with their Establishment Clause claim, plaintiffs do not explain how, if traditional marriage exists to promote religious exercise, expanding the definition to include same-sex couples, rather than invalidating civil marriage completely, avoids that problem.  Ultimately they refute their own claim when they say that "[s]ince the state has determined to grant married couples a secular social status, the institution itself cannot be said to be an inherently religious one."  Pls.' Prelim. Inj. Mem. at 22.  They are correct, it is not, and States have sponsored civil marriage for centuries without any suggestion that marriage establishes religion.  Plaintiffs claim an Establishment Clause problem "to the extent" traditional marriage "is justified by the moral and religious beliefs of the majority." *Id.* As the statute is justified by entirely secular interests, *see* Part II.C.3., *supra*, Plaintiffs cannot succeed on this claim.

### G.     Traditional marriage does not violate the Supremacy Clause

Typically, claims brought under the Supremacy Clause assert that a federal statute or regulation preempts a state statute or regulation.  Here, Plaintiffs invoke no federal statutes but rely only on federal constitutional law, as embodied in *Windsor*.  It is therefore difficult to discern what this claim adds to Plaintiffs' substantive federal constitutional claims.  If *Windsor* had held that States must license and recognize same-sex marriages, then conflicting Indiana law would be required to give way.  The Court expressly disclaimed going that far.  Rather, *Windsor* emphasized that "[e]ach state as a sovereign has a rightful and legitimate concern in the marital

status of persons domiciled within its borders" and stressed that the "opinion and its holding are confined to [New York's recognition of] lawful marriages." *Windsor*, 133 S. Ct. at 2696.  As no federal law preempts Indiana's marriage definition, this claim is unlikely to succeed.

## CONCLUSION

The Court should deny Plaintiffs' Motion for Immediate Preliminary and Permanent Injunctive Relief.

GREGORY F. ZOELLER
Attorney General of Indiana

*s/ Thomas M. Fisher*
Thomas M. Fisher
Solicitor General

Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
Tel: (317) 232-6255
Fax: (317) 232-7979
Tom.Fisher@atg.in.gov

*Counsel for Governor Michael Pence*

## CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2014, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which sent notification of such filing to the following:

|  |  |
|---|---|
| Daniel J. Canon | Dawn R. Elliott |
| Laura Elizabeth Landenwich | Shannon Fauver |
| L. Joe Dunman | FAUVER LAW OFFICE PLLC |
| CLAY DANIEL WALTON & ADAMS PLC | dawn@fauverlaw.com |
| laura@justiceky.com | shannon@fauverlaw.com |
| joe@justiceky.com |  |
| dan@justiceky.com |  |

_s/ Thomas M. Fisher_
Thomas M. Fisher
Solicitor General

Office of the Attorney General
Indiana Government Center South 5th Floor
302 W. Washington St.
Indianapolis, IN 46204-2770
Phone:  (317) 232-6255
Fax:  (317) 232-7979
Email: Tom.Fisher@atg.in.gov